**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

---

MICRO FOCUS (US), INC. and MICRO
FOCUS IP DEVELOPMENT LIMITED,

       *Plaintiffs/Counterclaim-
       Defendants*,

       v.

AMERICAN EXPRESS COMPANY,

       *Defendant/Counterclaim-
       Plaintiff.*

No. 1:15-CV-07438-PGG

---

### PLAINTIFFS/COUNTERCLAIM-DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT/COUNTERCLAIM-PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

James D. Weinberger (jweinberger@fzlz.com)
Jessica Vosgerchian (jvosgerchian@fzlz.com)
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
4 Times Square, 17th Floor
New York, New York 10036
Tel:  (212) 813-5900
Fax:  (212) 813-5901

Stuart M.G. Seraina (sseraina@kg-law.com)
  (admitted *pro hac vice*)
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
Tel:  (410) 752-6030
Fax:  (410) 539-1269

*Attorneys for Plaintiffs/Counterclaim-Defendants*

{F2167815.1 }

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 3

I.      The APA and the MLA ................................................................................................. 3

II.     The Parties' English Law Experts ................................................................................ 5

ARGUMENT ............................................................................................................................. 6

I.      The Scope of the APA under English Law Permits Plaintiffs' Copyright Claim ............... 6

        A.      Relevant Principles of English Contract Law ............................................. 7

        B.      The APA Only Permits Annual-Term, Single-Server Licenses ............................. 8

        C.      American Express Received a Sublicense that Identex Had No Right to
                Grant, Giving Rise to Micro Focus's Copyright Infringement Claim ................. 10

II.     American Express's Expert, Not Relied on in its Motion,
        Supports Micro Focus' Reading of the APA .................................................................. 11

        A.      Edenborough Agrees that the APA Only Allows Annual-Term Sublicenses ........ 12

        B.      Edenborough's Interpretation of the APA as Providing Only Limited
                Remedies to Micro Focus is Irrelevant and Not Supported under English Law ... 12

III.    Even if the MLA Were Valid, the Annual-Term and
        Single-Server Limitations are Conditions of the APA .................................................. 17

        A.      Contractual Terms Which Implicate Exclusive
                Rights under Copyright are Conditions ........................................................ 17

        B.      American Express's Attempt to Characterize the Limited Sublicensing
                Right as Merely Relating to Payment is Unsupported in Fact and Law ................ 20

                1.      The Limited Sublicense Grant Does Not Merely Relate to Payment ........ 21

                2.      The Cases Cited by American Express Do Not Support the Argument
                        that the Relevant APA Terms Are Covenants in Any Event ..................... 21

CONCLUSION ........................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

### U.S. CASES

*Accusoft Corp. v. Quest Diagnostics, Inc.*,
    No. 12-CV-40007-TSH, 2015 WL 10718481 (D. Mass. Oct. 1, 2015)......................17, 22

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................................................7

*Ariel (UK) Ltd. v. Reuters Grp. PLC*,
    05-CV-9646 (JFK), 2006 WL 3161467 (S.D.N.Y.
    Oct. 31, 2006), *aff'd,* 277 F. App'x 43 (2d Cir. 2008)......................................10

*BroadVision, Inc. v. Med. Protective Co.*,
    08-CV-1478 (WHP), 2010 WL 5158129 (S.D.N.Y. Nov. 23, 2010) .........................21-22

*Energy Intelligence Grp., Inc. v. Tudor, Pickering, Holt & Co. Sec., Inc.*,
    12-CV-1945 (NFA), 2013 WL 321668 (S.D. Tex. Jan. 28, 2013) ...................................19

*Gilliam v. Am. Broad. Cos.*,
    538 F.2d 14 (2d Cir. 1976)........................................................................ *passim*

*Graham v. James*,
    144 F.3d 229 (2d Cir. 1998)...................................................................... *passim*

*Harrell v. Van der Plas*,
    08-CV-8252 (GEL), 2009 WL 3756327 (S.D.N.Y. Nov. 9, 2009) ...................................10

*Intel Corp. v. Broadcom Corp.*,
    173 F. Supp. 2d 201 (D. Del. 2001)................................................................13

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010) .........................................................................16

*LGS Architects, Inc. v. Concordia Homes of Nev.*,
    434 F.3d 1150 (9th Cir. 2006) ......................................................................18

*Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*,
    387 F. Supp. 2d 521 (M.D.N.C. 2005) ...........................................................22

*Major League Baseball Promotion Corp. v. Colour-Tex, Inc.*,
    729 F. Supp. 1035 (D. N.J. 1990) .................................................................20

*In re McMahon*,
    235 B.R. 527 (S.D.N.Y. 1998)........................................................................9

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
 629 F.3d 928 (9th Cir. 2010) ........................................................... 18-19, 23

*Netbula, LLC v. Storage Tech. Corp.*,
 06-CV-7391 (MJJ), 2008 WL 228036 (N.D. Cal. Jan. 18, 2008) ....................................20

*Pac. Stock, Inc. v. Pearson Educ., Inc.*,
 927 F. Supp. 2d 991 (D. Haw. 2013) ............................................................19

*Perfect 10, Inc. v. Google, Inc.*,
 653 F.3d 976 (9th Cir. 2011) ...................................................................19, 23

*Quest Software, Inc. v. DirecTV Operations, LLC*,
 09-CV-1232 (AG)(ANx), 2011 WL 4500922 (C.D. Cal. Sept. 26, 2011) ......................22

*Reinsdorf v. Skechers U.S.A.*,
 922 F. Supp. 2d 866 (C.D. Cal. 2013) ............................................................18

*Reis, Inc. v. Spring11 LLC*,
 15-CV-2836 (PGG)(JCF), 2016 WL 5390896 (S.D.N.Y. Sept. 26, 2016)......................20

*Sun Microsystems, Inc. v. Microsoft Corp.*,
 81 F. Supp. 2d 1026 (N.D. Cal. 2000) ......................................................22-23

*Sun Microsystems, Inc. v. Microsoft Corp.*,
 188 F.3d 1115 (9th Cir. 1999) ...............................................................22-24

*Tangorre v. Mako's, Inc.*, No.
 01-CV-4430 (BSJ)(DF), 2003 WL 470577 (S.D.N.Y. Jan. 6, 2003) ...............................17

*Ward v. Nat'l Geographic Soc.*,
 208 F. Supp. 2d 429 (S.D.N.Y. 2002)......................................................10, 19

## ENGLISH CASES

*Arnold v. Britton*
 [2015] UKSC 36, [2015] AC 1619, [2015] 2 WLR 1593 ................................. 7-8, 12, 14

*Rainy Sky v. Kookmin Bank*
 [2011] UKSC 50 ......................................................................................9

## STATUTE

17 U.S.C. § 106............................................................................... 3, 18-20

**RULE**

Fed. R. Civ. P. 56(a) ........................................................................................7

**TREATISES**

Joseph Chitty, *I Chitty on Contracts* (27th ed. 1994) ....................................9

Copinger & Skone James on Copyright (17th ed.)........................................17

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (MB, rev. ed.)...................... 17-18

Plaintiffs and Counterclaim-Defendants Micro Focus (US), Inc. and Micro Focus IP Development Ltd. (together, "Micro Focus" or "Plaintiffs") hereby submit this memorandum of law in opposition to Defendant and Counterclaim-Plaintiff American Express Company's ("American Express" or "Defendant") motion for summary judgment.

## PRELIMINARY STATEMENT

This is an action for copyright infringement over American Express's admitted use of Micro Focus's copyrighted runtime software ("RTS"). American Express seeks summary judgment on the basis that the contested use was authorized under a sublicense from the company Firstlogic Inc. ("Firstlogic"), which along with its affiliate Identex Limited ("Identex") received authorization from Micro Focus to issue sublicenses to third parties in a contract called the Application Provider Agreement ("APA"). Micro Focus and American Express dispute the construction of the APA, which is governed by English law, and its application to this action. As set forth herein, American Express's motion should be denied, and summary judgment granted to Micro Focus as requested in its simultaneously filed cross-motion.

Defendant's position in this case has been a moving target since the outset. At the initial conference, despite plain and direct language in the APA to the contrary, American Express's counsel advised the Court that the APA permitted Identex and Firstlogic to "make [the grant of rights to the RTS] an annual license" to third parties that was "unlimited in terms of the numbers of servers" with "no restriction on what Identex needed to do in terms of downstream users." (*See* April 13, 2016 Transcript at 8, a copy of which is attached as Exhibit D to the Declaration of James D. Weinberger in Opposition to Defendant's Motion for Summary Judgment ("Weinberger Opp. Decl.")). In discovery, however, Defendant was forced to make an about-face, as its English law expert conceded that the APA only gives Identex and Firstlogic the right

to grant annual, single-server sublicenses to the RTS.  Weinberger Opp. Decl. Ex. E at 52:3-53:12.  Defendant's expert opined instead that American Express's real defense was that the prohibitions against issuing perpetual, multi-server sublicenses were contractual terms that left the APA in place, not subject to termination under English law, thus barring any claims by Micro Focus in this action.  *Id*. at 72:24-73:15. This theory of construction, however, is not consistent with English law and in fact is so novel that Defendant's expert had never in his 20 years of practice seen another clause in any agreement that had a similar construct.  *Id*. at 21:11-23.  In other words, American Express's position has been exposed for what it is:  a *post hoc* attempt by counsel to avoid an obvious infringement claim.

Now, American Express has changed its tune yet again, arguing in its motion that the key provisions of the APA—which plainly govern the nature of the sublicenses that may be granted by Identex and Firstlogic—are mere contractual covenants relating *only to payment* to Micro Focus.  *See* Defendant American Express Company's Memorandum of Law in Support of its Motion for Summary Judgment Regarding the Scope of the License Granted in the Micro Focus Application Provider Agreement ("Def's Br.") at 14-16, 17-21.  Under this construct, Micro Focus's sole remedy for American Express's breach would be a contract claim against Identex.  But American Express's position is again belied by the terms of the APA, which do not merely set pricing terms, but rather narrowly define the nature of the types of sublicenses that it can provide to annual, per-server grants.  Defendant's construction requires the Court to ignore certain provisions of the APA and read others acontextually, in violation of English law.

Even if the Court views Micro Focus's claim through the lens American Express suggests, Defendant's motion must *still* be denied because the restriction on Identex's ability to grant anything other than annual, one-server licenses is a condition of the license.  Ultimately,

the outcome of the condition/covenant question, irrespective of what state or national law governs the contract, is a question of copyright law. As held by courts and the leading U.S. copyright law treatise, where the subject matter of a contested contractual provision involves one of the exclusive rights provided to copyright owners under Section 106 of the Copyright Act, it is a condition of the right granted, not a mere contractual covenant.

To decide these cross-motions, the Court must consider the plain language of the APA together with English law's requirement to construe contracts based on commercial common sense and the view of a reasonable person having all the background knowledge which was available to the parties when the agreement was made. Applying these principles, the result is obvious: the APA expressly prohibits the perpetual license American Express received, and thus it is invalid. American Express has been running from the language of the APA since the outset of this action, seeking to twist and mold the agreement to escape the fact that it acquired and uses the RTS by a sublicense that Identex and Firstlogic never had the right to grant. Consequently, Micro Focus's copyright action should proceed and Defendant's motion should be denied.

## STATEMENT OF FACTS

### I.    The APA and the MLA

Plaintiffs, a global software company and its United States affiliate, are the makers of the RTS, which is software that, *inter alia*, enables newer software applications to run using older code. (Declaration of Susan Drennan ("Drennan Decl."), ¶ 2.) Identex's IACE Application, which incorporates the RTS, allows businesses such as American Express to track customer information and ensure communications are received by the correct individuals. (*Id.* at ¶ 3.) Identex's IACE Application cannot function without the RTS. (*Id.*)

Micro Focus and Identex had agreements prior to 2004 that allowed Identex to use the

RTS and sublicense it to third parties on a perpetual basis as part of the IACE Application.  (*Id.* ¶ 4, Ex A.)  On March 2, 2004, Micro Focus and Identex entered into the APA, a new license agreement that changed the sublicensing scheme from a system that permitted perpetual licenses for the RTS to one that allowed only annual-term, one-server licenses.  (*Id.* ¶ 5, Ex. A. at T&C ¶ 2.1; Decl. of Hon. Ret. Prof. Sir Robin Jacob ("Jacob Decl."), ¶ 42.)  Identex's distributor Firstlogic is bound by the same terms as Identex.  (Drennan Decl. Ex. A at Ex. 1, ¶ 5.)

Section 2.1 of the APA provides Identex with the right, on a non-exclusive basis, to market and distribute the RTS as part of the IACE Application, but makes no mention of any right of Identex to issue sublicenses.  (*Id.* at Terms & Conditions ("T&C") ¶ 2.1.)  A right to sublicense is only set forth in Section 3: Paragraph 3.1.5 of the Terms and Conditions provides that to the extent Identex issues sublicenses as part of its marketing and distribution of the APA, it must "limit[] the license granted to a per [server] license . . . and to an annual term . . . ."  (*Id.* ¶ 3.1.5.)  Likewise, Paragraph 3.2 states that Identex may not "[o]btain or provide a license term for the RTS other than an annual renewable license term."  (*Id*. ¶ 3.2.8.)  The APA's cover letter states that the APA only permits annual-term sublicenses: "The Agreement authorizes you [Identex] to distribute annual licenses for the . . . RTS . . . in conjunction with your own application program[] . . . Names, Scans and IACE."  (*Id.* at Cover Letter, ¶ 2.)  Section 3 imposes other prohibitions, including that Identex may not "copy, or give third parties the right to copy or (save as provided in Exhibit 1) distribute all or part of the RTS or Development Software," "modify, reverse engineer, reverse compile or disassemble the RTS or the Development Software," or "distribute copies of all or part of the RTS that do not form part of the Application package."  (*Id.* at T&C ¶¶ 3.2.1-3.)  English law governs the APA.  (*Id.* ¶ 6.7.1.)

The business purpose of the APA was to transition the parties from a scheme of issuing

perpetual sublicenses for the RTS to one allowing only annual, per-server sublicenses.  (Drennan Decl. ¶ 5; Jacob Decl. ¶ 42(a).)  Exhibit 1 of the APA, entitled "Upgrading Existing Application Provider Customers" provides that existing customers who have perpetual licenses for "previous versions" of the RTS are identified in Appendix C to the APA and may upgrade to the current version of the RTS under the new annual, per-server license system.  (Drennan Decl. Ex. A at Ex. 1, ¶ 2.)  American Express is not listed among them.  (*Id.* at Appendix C.)

Firstlogic and American Express entered into the Master License Agreement ("MLA") on January 30, 2004.  (Weinberger Opp. Decl. Ex. F.)  The MLA provided American Express with a license to use the IACE Application (*id.* ¶ 1.1, at Ex. A, Clause III), which necessarily also entailed use of the embedded RTS.  (*See generally* Drennan Decl. Ex. A.)  The term of the MLA is "[p]erpetual" and the scope is "not limited to location or number of processors."  (Weinberger Opp. Decl. Ex. F at Ex. A, Clauses IV, VI.)

## II.     The Parties' English Law Experts

As set forth in Paragraph 6.7.1, the APA is governed by English law.  Plaintiffs rely on the testimony of the Right Honourable Professor Sir Robin Jacob on English law principles of contract interpretation to assist the Court in review of the scope of the license granted to Identex and Firstlogic in the APA.[1]  Sir Robin testified on Defendant's cross-motion about the governing principles of contract interpretation and concluded that Plaintiff and Identex intended the APA to permit only sublicenses limited to one year and one server.  (Jacob Decl. ¶ 42.)

To rebut Sir Robin's findings, American Express engaged English intellectual property attorney Michael Edenborough to interpret the APA under English law principles of contract

---

[1] Sir Robin is a Professor of Intellectual Property at University College London and a former Lord Justice of Appeal of the Court of Appeal of England and Wales.  (Jacob Decl. ¶ 2.)  From 2003 until he decided to leave the Court and take up his current position in 2011, Sir Robin was in charge of the Intellectual Property List and sat on nearly all IP cases in the Court of Appeal.  (*Id*. Ex. B at ¶ 9.)

construction in a report disclosed to Plaintiffs on September 7, 2016.  (Expert Report of Michael Edenborough (Weinberger Opp. Decl. Ex. G).)  Edenborough cited the same case authority and standard of construction as Sir Robin, and concluded that the APA prohibited Application Providers (such as Identex and Firstlogic) from granting sublicenses not limited to one year and one server.  (*Id*. at ¶¶ 6, 31-33.)  Edenborough opined, however, that Plaintiffs' copyright infringement is nonetheless barred because the granting of a sublicense violating that prohibition, such as the license obtained by American Express, is not a breach that would justify termination of the entire APA.  (*Id*. at ¶ 21.)  In Plaintiff's deposition of Edenborough, he conceded that his expert report did not purport to analyze whether English law recognized concepts analogous to covenants and conditions in U.S. law, and that the closest analogy, "warranties," are essentially no longer part of English contract law.  (Weinberger Opp. Decl. Ex. E at 82:2-16.)  He also testified that he had never seen a license agreement with the construction he applied to the APA, and was aware of no English case supporting such a construction.  (*Id.* at 22:11-23:13.)

## ARGUMENT

**I.    The Scope of the APA under English Law Permits Plaintiffs' Copyright Claim**

American Express's constant maneuvering, during this litigation, cannot change the plain, clear language of the APA, which prohibits the exact type of license to the RTS that American Express purportedly obtained from Firstlogic.  Under established Second Circuit precedent, any sublicense (such as the MLA) that exceeds the scope of rights provided to the sublicensor (here, Identex and Firstlogic under the APA) is invalid and cannot be read to shield liability for copyright infringement.  *Gilliam v. Am. Broad. Cos.*, 538 F.2d 14, 20-21 (2d Cir. 1976).  The unambiguous reading of the APA under English law is that Identex and Firstlogic acquired the right to grant sublicenses limited to one server and one year.  *See* Memorandum of

Law in Support of Plaintiffs' Motion for Partial Summary Judgment at 7-10.  Since the MLA and

American Express's use of the RTS exceed those terms, American Express's use is not properly

licensed and therefore infringes Plaintiffs' copyright.  Accordingly, American Express has failed

to meet its burden of proving that "there is no genuine issue as to any material fact and the

movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court should

therefore deny American Express's motion for summary judgment because "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Moreover, the Court should grant Plaintiffs' cross-

motion for partial summary judgment because Plaintiff's reading of the APA is correct.

## A.       Relevant Principles of English Contract Law

Under English law, a contract is interpreted according to its plain and ordinary meaning

based on "what a reasonable person having all the background knowledge which would have

been available to the parties would have understood them to be using the language in the contract

to mean."  *Arnold v. Britton* [2015] UKSC 36, [2015] AC 1619, [2015] 2 WLR 1593; s*ee also*

Jacob Decl. ¶¶ 17-33.  English courts construe contractual language by considering "(i) the

natural and ordinary meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the

overall purpose of the clause and the lease, (iv) the facts and circumstances known or assumed

by the parties at the time that the document was executed, and (v) commercial common sense,

but (vi) disregarding subjective evidence of any party's intentions."  *Arnold v. Britton* [2015]

UKSC 36; Jacob Decl. ¶¶ 17-33.  When applied to the APA, these factors establish that sections

3.1.5 and 3.2.8 limit the scope of the sublicensing right granted to Identex and Firstlogic.

English law dictates that the agreement must be construed as a whole rather than

dissected acontextually, in other words, taking particular contract language and reading it

without regard to other language.  Jacob Decl. ¶ 27(b).  To determine the impact of any one clause of a contract, the Court must consider "any other relevant provisions" and "the overall purpose of the clause and the lease."  *Arnold v. Britton* [2015] UKSC 36.

### B.      The APA Only Permits Annual-Term, Single-Server Licenses

When read together in context, paragraphs 2.1, 3.1, 3.1.5, 3.2 and 3.2.8 of the APA clearly indicate that the agreement permits only the granting of annual, one-server sublicenses. Jacob Decl. ¶¶ 17-33.  In Paragraph 2.1.1, Micro Focus grants to Identex a non-exclusive license to market and distribute the RTS specifically for use in the IACE application.  Drennan Decl., at T&C ¶ 2.1.1.  No right to sublicense the RTS is provided in Section 2; rather, the scope of the sublicensing right provided in the APA is expressly set forth in Section 3.  Paragraph 3.1.5 states that copies of the RTS distributed under the APA must be subject to an end-user agreement that "limits the license granted to per [server] license . . . and to an annual term," *id.* at ¶ 3.1.5, and Paragraph 3.2.8 confirms this, stating that Identex, or by extension Firstlogic, "may not: . . . [o]btain or provide a license for the RTS other than an annually renewable license term."  *Id.* at ¶ 3.2.8.  The clear language of the APA thereby establishes a sublicensing right that the MLA exceeds, rendering it invalid.

Also relevant to a contextual reading of the APA are background facts known to the parties when they entered the agreement, which in this case prove that the parties intended to limit the sublicensing right to annual, one-server licenses.  Jacob Decl. ¶ 18(e).  "When interpreting a contractual provision, one can only take into account facts or circumstances which existed at the time that the contract was made, and which were known or reasonably available to both parties."  Jacob Decl. at ¶ 30 (quoting *Arnold v. Britton*).  Given the context of Micro Focus's decision to stop allowing perpetual licenses, which can be gleaned from the APA itself,

any reasonable person with knowledge of that history would discern that the differences between the APA and prior license agreements express the altered scope of the sublicensing grant. Identex had obtained perpetual licenses from Micro Focus before Micro Focus changed its sublicensing scheme, and had access to Exhibit 1 to the APA's cover letter, which references the perpetual licenses held by existing customers to older Micro Focus products.  Drennan Decl. Ex. A at Cover Letter, ¶ 2.  Thus, parties absolutely knew of the background facts concerning Micro Focus's decision to narrow the sublicensing right it would grant going forward.

This reading makes commercial business sense considering the background of the change in Micro Focus's sublicensing policy with respect to the RTS.  English law favors the construction "which is consistent with business common sense."  *Rainy Sky v. Kookmin Bank* [2011] UKSC 50 (cited in Jacob Decl. ¶ 29, subp. 16, 21).  "A commercial construction is more likely to give effect to the intention of the parties than 'too nice a concentration on individual words.'"  *See also In re McMahon*, 235 B.R. 527, 533 (S.D.N.Y. 1998) (quoting Joseph Chitty, *I Chitty on Contracts*, ¶ 12-040 (27th ed. 1994).)  As noted by Sir Robin, "[t]he clear business purpose of the APA is to move from a system whereby [Identex] granted perpetual licenses under [Micro Focus's] copyright to one by which it granted annual licenses only."  Jacob Decl. at ¶ 42(a).  The parties took care to identify existing end users with perpetual licenses who could either retain them or elect to upgrade their software with an annual, one-server license.  *Id.* at ¶ 42(d).  The APA makes no such provision for end users obtaining new perpetual licenses because the parties did not intend for such licenses to exist.  Under the English principles of contract interpretation, the sublicensing right provided to Identex and Firstlogic in the APA is limited in scope to annual, one-server licenses.

### C.     American Express Received a Sublicense that Identex Had No Right to Grant, Giving Rise to Micro Focus's Copyright Infringement Claim

Because the perpetual sublicense American Express obtained in the MLA exceeds the scope of Firstlogic's sublicensing right, the MLA is invalid and American Express is liable for copyright infringement. *Gilliam*, 538 F.2d at 20-21.  American Express does not cite *Gilliam*, relying instead on *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998), which addresses the situation where the claimed copyright infringement is the subject of a valid license, delineating when the licensor nonetheless has a copyright claim (because the breached term is a condition) or not (because the breached term is a covenant).  But *Graham* expressly provides that where "the contested issue is the *scope* of a license, rather than the *existence* of one, the copyright owner bears the burden of proving that the defendant's copying was unauthorized." *Graham*, 144 F.3d at 236 (emphasis in original).  This is precisely the main holding of *Gilliam* and the restatement of the burden of proof is no different than any other copyright infringement claim where the plaintiff bears the burden of proving its claim.

Indeed, recognizing that copyrights consist of several distinct rights that can be licensed separately or in a limited form, the Second Circuit has held that a licensor retains the right to bring an infringement claim against a licensee whose use exceeds the rights granted. *Gilliam*, 538 F.2d at 20; *see also Harrell v. Van der Plas*, 08-CV-8252 (GEL), 2009 WL 3756327, at *2 (S.D.N.Y. Nov. 9, 2009) (Lynch, J.) ("It is black-letter law that a claim for copyright infringement lies when a party's use of copyrighted material exceeds the scope of its license.")  Moreover, a licensee cannot validly sublicense its acquired rights unless expressly authorized to do so by the licensor.  *See Ariel (UK) Ltd. v. Reuters Grp. PLC*, 05-CV-9646 (JFK), 2006 WL 3161467, at *6 (S.D.N.Y. Oct. 31, 2006), *aff'd,* 277 F. App'x 43 (2d Cir. 2008); *Ward v. Nat'l Geographic Soc.*, 208 F. Supp. 2d 429, 443 (S.D.N.Y. 2002) (denying summary judgment

motion because the copyright owner did not expressly authorize sublicense, so activity under the sublicense was likely copyright infringement) ("By licensing rather than assigning his or her interest in a copyright, a copyright owner reserves certain rights. . . .  The owner's ability to monitor use would be jeopardized by allowing sublicensing without notice.")  The APA, in which every reference to the right to grant downstream sublicenses contains restrictions as to duration (annual) and number (one server), prohibits the license that Firstlogic purported to grant American Express.  Since the MLA exceeds Firstlogic's authority to sublicense, American Express has no valid license to use the RTS, and so cannot defend against Plaintiffs' infringement claim on that basis.

## II.    American Express's Expert, Not Relied on in its Motion, Supports Micro Focus's Reading of the APA

After disclosing in discovery expert testimony of its own expert, English intellectual property law attorney Michael Edenborough (Weinberger Opp. Decl. Ex. G), American Express did not submit any testimony from him in its motion for summary judgment.  It is not surprising that American Express would ignore its expert's findings, as Edenborough reached the same conclusion as Sir Robin – that the APA bars perpetual, multi-server sublicenses to use the RTS – and presented in American Express's defense only a novel, unfounded theory of contract interpretation under English law.  An examination of Edenborough's attempt to excuse American Express under the relevant English legal framework exposes the futility of American Express's position that it has not infringed Plaintiffs' copyright in the RTS.[2]

---

[2] As set forth below, in an attempt to hide the fact that both parties' experts concluded that the APA prohibits its sublicense, American Express now refuses to grapple with English law at all. Despite the APA's clear provision that English law governs its interpretation (6.7.1), American Express proffers arguments in its moving brief based on *U.S. common law* contract interpretation (Def's Br. at 7), effectively conceding that no interpretation of the APA under English law permits the sublicense it received from Firstlogic.

### A.      Edenborough Agrees that the APA Only Allows Annual-Term Sublicenses

Edenborough agrees with Sir Robin that under English contract law the APA prohibits

the kind of license American Express obtained, but argues that American Express's license is

nonetheless valid because exceeding the annual-term and server limitations would not justify

termination of the entire APA.  Weinberger Opp. Decl. Ex. E at 27:1-16, 39:15-20, 81:18-23.

According to Edenborough's reading of the APA, if both parties uphold their obligations, the

contract functions exactly as Plaintiffs describe: Identex and its distributor Firstlogic issue only

annual, one-server licenses.  *Id*. at 53:3-4 ("And so the final result is a license with an annual

term . . . .").  Under *Gilliam*, discussed above, the analysis should end here.

### B.      Edenborough's Interpretation of the APA as
###          Providing Only Limited Remedies to Micro Focus is
###          Irrelevant and Not Supported under English Law

Knowing that the plain meaning of the APA subjects American Express to copyright

infringement, Edenborough constructs a novel theory: that the location of the sublicensing right

in the APA in Section 3, separate from the grant of rights to distribute copies of the RTS in

Section 2.1, changes the remedies available to Micro Focus in the event that a sublicense is

issued beyond what was permitted.  Weinberger Opp. Decl. Ex. E at 53:3-8 ("[T]the place in the

chain where that annual license has been inserted is one down, or at a different link from the first

link in the chain . . . .   Now, if the whole agreement works and everybody does what they're

supposed to do, the final results are the same, but if there's a hiccup somewhere along, it matters

which link in the chain has been broken.").

While Edenborough cites the correct legal framework in reaching this conclusion –

namely, the principles of interpretation in *Arnold v. Britton* [2015] U.K.SC 36 – his analysis of

the APA does not follow it.  First, he frames the question as whether American Express's

unauthorized sublicense is the type of breach that would allow Micro Focus to terminate the APA entirely, and determines that Plaintiffs' copyright infringement claim is barred because the sublicense to American Express leaves the APA intact.  The correct inquiry, however, is whether American Express's sublicense exceeds the scope of the sublicensing right granted in the APA. It is irrelevant that the overall license agreement survives the creation of an invalid sublicense. American Express is liable for copyright infringement so long as its use of the RTS exceeds the scope of Identex's sublicensing power under the APA.  *Gilliam*, 538 F.2d at 20.

Edenborough also makes an artificial distinction between the "license grant" in Section 2.1 and the provisions of Section 3, arguing that the former is a broad grant, restricted by later, separate contractual promises by Identex to restrict its use thereunder.  Weinberger Opp. Decl. Ex. G at ¶ 33; Ex. E at 20:25-21:10.  This distinction is pure sophistry, and it fails under English law, just as it would under U.S. law.  *Cf. Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 211-12 (D. Del. 2001) (finding section of license grant entitled "License to Broadcom" was impacted by a later clause in the agreement entitled "Patent Covenant," which laid out additional restrictions).  In Edenborough's conception, the APA grants a license in a "two-step process" in which Identex first obtains an unfettered sublicensing right and then relinquishes its ability to fully exercise that right.  Weinberger Opp. Decl. Ex. E at 52:3-9.  However, Edenborough cites no authority either recognizing his novel distinction between "one-step" and "two-step" license agreements, or supporting his conclusion that a licensee's available causes of action differ depending on which category the license agreement fits.  This is not surprising considering that in decades of legal practice he has never seen a contract with the structure he describes.  *See*, *e.g.*, *Id.* at 23:12-13 ("I can't give you a concrete example where I have seen exactly the same construction."); 24:5-7 ("I cannot give you a particular case that has exactly the same factual

construction of a license agreement as has arisen in this case.").

Following the proper analysis, Edenborough's novel view of the APA plainly violates established English law principles of interpretation.  First, it is acontextual.  *Arnold v. Britton* requires that contract interpretation involve analyzing the meaning of the relevant words "in their documentary, factual, and commercial context," including "in light of . . . any other relevant provisions of the [contract and] the overall purpose of the clause and the [contract]."  Weinberger Opp. Decl. Ex. G, ¶ 6.)  Yet, as noted by Sir Robin, Edenborough's construction of the APA "involves reading Clause 2.1 acontextually—as though the rest of the agreement did not qualify and limit the power granted by Clause 2.1.  Such an acontextual reading is anathema to English law principles of construction."  Jacob Decl., ¶ 41(i).

Second, Edenborough's interpretation would render certain provisions of the APA superfluous, in violation of English law.  *Id.*  Section 2.1.1 of the APA provides Identex with a license to "market and distribute for Application Provider's customers ('Application Provider Customer(s)') for use with Application Provider's own Application object code copies of RTS products manufactured by Micro Focus and delivered to Application Provider in pre-packaged form by Micro Focus."  Under Edenborough's interpretation of the APA, this is the "unfettered," broad license to the RTS; the prohibition against anything other than annual-term and per-server licenses in Section 3.2 are mere contractual obligations of Identex to Micro Focus not to exercise what the license permits it to do.  But this view of the agreement falls apart when applied to other provisions of Section 3.2.  For example, Section 3.2.1 provides that Identex would not "copy or give third parties the right to copy or . . . distribute all or part of the [Micro Focus] Software."  But the license grant in Section 2.1.1 does not provide Identex with the right to copy or give third parties the right to copy the RTS.  The "hold back" in 3.2.1 is not something the "license" of

2.1.1 permits in the first place.  Under Edenborough's reading of the agreement, there is no reason to have the provision in 3.2.1 at all, rendering it superfluous.  The same goes for 3.2.2, in which Identex agreed not to "modify, reverse engineer, reverse compile or disassemble the [Micro Focus] Software."  Since the license grant in 2.1.1 does not allow modification, reverse engineering and the like, Section 3.2 serves no purpose if Edenborough is correct.

The prohibition in Section 3.2.3 would be similarly superfluous, though for a different reason.  Section 3.2.3 provides that Identex may not "distribute copies of all or part of the RTS that do not form part of the Application Package."  But the language of 2.1.1 that provides the license already makes clear that Identex may only distribute copies of the RTS if it is part of Identex's IACE software.  If Edenborough's reading is applied, 3.2.3 serves no purpose because the license on its face does not allow what 3.2.3 prohibits.  This contravenes the English law principal of reading a contract to give meaning to its various parts.  Jacob Decl., ¶ 40(i); *see also* Weinberger Opp. Decl. Ex. E at 64:22-65:2.)

Third, as explained in Section I, above, Edenborough's interpretation of the APA is irrational in light of the background facts known by both parties.  Micro Focus's shift from granting perpetual licenses to only allowing annual, one-server licenses would have been clear to Identex, a longtime business partner of Micro Focus.  Drennan Decl. ¶¶ 4-5, Ex. A.  In light of the references to the prior licensing scheme in Exhibit 1 to the APA's cover letter and the new prohibitions of 3.1.5 and 3.2.3, mutual knowledge of the narrowed sublicensing grant is indisputable.  *Id.* Ex. A.

Finally, Edenborough's interpretation of the APA violates English law principles of contract construction because it makes no business sense.  As noted above, he agrees with Sir Robin on how the APA functions if there is no breach: Identex and Firstlogic cannot grant

anything other than annual, per-server licenses.  Under Edenborough's view, Micro Focus could have no claim against the end user in the event of a breach.  As a practical matter, this makes no sense.  Why would the parties do this and not state so clearly?  Why would they have failed to say anything about this issue in the APA's section on remedies?  Drennan Decl. Ex. A, T&C ¶ 6.3.  Edenborough offered no possible commercial, business reason for this construction because there is none.  Weinberger Opp. Decl. Ex. E at 62:6-63:7.

Acknowledging that commercial common sense is an important factor under the English standard, Edenborough attempts to downplay the implications of this factor by stating that the Court must consider the APA's words before reaching it.  *Id*. at 42:10-43:16.  However, Edenborough conceded that the words of 2.1 alone do not sufficiently capture the sublicense grant: "the agreement does not expressly provide for sublicensing or sub-sublicensing, but the reason why that is not important is because it's blindingly obvious that that provision must exist, otherwise the whole thing falls apart."  *Id*. at 38:6-16.  But Edenborough is wrong.  The APA does not imply the sublicensing grant but rather states it in Sections 3.1.5 and 3.2.8.

Considering all of this, it is unambiguous that the scope of the license grant under the APA is limited to issuance of annual-term, one-server sublicenses.  *See Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (noting that "no ambiguity exists where the alternative construction would be unreasonable") (citation omitted).  American Express's own expert recognizes that the APA's language prohibits sublicenses like the one American Express acquired.  To acknowledge this fact and yet still attempt to excuse American Express, Edenborough misconstrues English law and promotes a peculiar construction of the APA that even he has never seen in another contract.  It is no wonder that American Express failed to even mention Edenborough in its brief.

**III.    Even if the MLA Were Valid, the Annual-Term and
          Single-Server Limitations are Conditions of the APA**

Knowing that Edenborough's disclosed opinion cannot help its defense, American

Express offers yet another theory in its summary judgment motion: that the breached terms of the

APA relate to payment, not the temporal and numerical scope of the sublicense right granted to

Identex, and therefore are covenants prohibiting Micro Focus's copyright claims under *Graham*,

144 F.3d at 236-37.  As discussed in detail above, American Express is wrong as this is not a

case that falls under *Graham*.[3]  But even if the Court undertakes the *Graham* analysis, Plaintiffs

would nevertheless have a copyright infringement claim against American Express.

**A.    Contractual Terms Which Implicate Exclusive
        Rights under Copyright are Conditions**

As explained above, when a licensee breaches a covenant of a license, the licensor has a

breach of contract claim; but if the licensee breaches a condition of the license, the licensor has a

copyright claim because "the rights . . . have not been effectively licensed."  *Graham*, 144 F.3d

at 236-37 (citing 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.15[A]

(MB, rev. ed.).  Courts applying *Graham* generally look to state contract law to help them

understand the difference between conditions and covenants.  *See, e.g., Tangorre v. Mako's, Inc.,*

No. 01-CV-4430 (BSJ)(DF), 2003 WL 470577, at *7 (S.D.N.Y. Jan. 6, 2003) (Customer's use of

photographer's photographs violated condition precedent of contract under New York law and

thus was copyright infringement); *Accusoft Corp. v. Quest Diagnostics, Inc.*, No. 12-CV-40007-

---

[3] Although U.S. law dictates the analysis in this instance, English law is on all fours with this
treatment of contract terms which are grounded in copyright, as reflected in the treatise cited by
Edenborough.  Weinberger Opp. Decl., Ex. G, ¶ 18 (quoting Copinger & Skone James on
Copyright [5-238] (17th ed.)).  The treatise states, "A licensee who simply does something for
which he does not have permission will be acting beyond the terms of the license and thus
infringing."  *Id.*  An example of such conduct is a person with a license to print and sell copies of
a work but who authorizes its public performance, or who has the right to use another's work but
not to make alterations, yet modifies the work.  These examples relate to uses of the work that
are controlled exclusively by the copyright owner, such as the public performance right or the
right to make a derivative work.

TSH, 2015 WL 10718481, at *23 (D. Mass. Oct. 1, 2015 (denying summary judgment and

recognizing conditions that prevented waiver of copyright infringement claim).[4]  Irrespective of

the law of the contract, ultimately, the distinction turns on whether the disputed term relates to

one of the exclusive rights of the copyright owner under 17 U.S.C. § 106, or a separate promise

that does not involve those rights.  *See MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928,

938 (9th Cir. 2010); 3 *Nimmer* § 10.15[A][3] (2015).

Plaintiffs' allegations regarding American Express's copying and use of the RTS are

grounded in its exclusive rights under the Copyright Act (*e.g.*, the right to distribute copies),

meaning that the relevant terms are conditions of the sublicense rather than covenants.

Specifically, Courts have found that "temporal and geographic" limitations on the exercise of

such rights in license agreements constitute conditions, which if breached, give rise to a

copyright infringement claim, not merely a breach of contract claim.  *Reinsdorf v. Skechers

U.S.A.*, 922 F. Supp. 2d 866, 876 (C.D. Cal. 2013) (denying summary judgment of copyright

infringement claim that licensee copied photographs beyond temporal, geographical, and media

limitations of the license); *see also LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d

---

[4] Edenborough did not opine that English law recognizes the condition/covenant dichotomy.
This, too, for good reason: the closest analogy does not support American Express's position.
According to Edenborough, English law conceives of three types of contract terms: (1)
conditions, which allow a party to terminate the contract if breached; (2) warranties, which if
breached justify damages but not termination; and (3) intermediate terms, which may or may not
allow a party to end the contract depending on the seriousness of the consequences of the breach.
Weinberger Opp. Decl. Ex. G, ¶¶ 12-15.)  Warranties are extremely rare in modern English
contract law.  *Id.* Ex. E at 82:3-10 (". . . to be blunt, under English law warranties barely exist
nowadays.  It's either conditions or intermediate terms.").  If a term is not an obvious condition,
courts generally analyze them as intermediate terms in order to decide remedies based on the
severity of the breach's consequence.  *Id*. at 82:12-16 ("An intermediate term is halfway between
a warranty and a condition in that, depending upon the seriousness of the breach and the
consequences, it might either trigger the ability to claim only damages or it might trigger the
ability to bring the contract to an end.").  Edenborough acknowledged that the APA's prohibition
of perpetual, multi-server licenses in 3.1.5 is not a warranty, characterizing it as "quite a flexible
condition" that alternatively "could well arguably be considered to be an intermediate term."  *Id.*
at 92:24-93:4.  Either classification makes dismissal of Plaintiffs' claims at the summary
judgment stage inappropriate.

1150, 1156-57 (9th Cir. 2006), *implied overruling on other grounds recognized by Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011) (allowing claim that defendant exceeded scope of license by using plaintiff's architectural plans in another development without satisfying conditions for reuse).  On the same basis, courts have also recognized as conditions terms imposing numerical limits on the number of copies permitted.  *See Pac. Stock, Inc. v. Pearson Educ., Inc.*, 927 F. Supp. 2d 991, 998-99 (D. Haw. 2013) (denying summary judgment of claim that licensee breached condition of licenses by exceeding numerical limit on number of textbooks in which licensed images could appear); *Energy Intelligence Grp., Inc. v. Tudor, Pickering, Holt & Co. Sec., Inc.*, 12-CV-1945 (NFA), 2013 WL 321668, at *3 (S.D. Tex. Jan. 28, 2013) (allowing infringement claim based on licensee breaching single-user limitation of subscription license).  Indeed, the Ninth Circuit has held up numerical limits as the textbook example of a condition to a copyright license:

> "[C]onsider a license in which the copyright owner grants a person the right to make one and only one copy of a book with the caveat that the licensee may not read the last ten pages. Obviously, a licensee who made a hundred copies of the book would be liable for copyright infringement because the copying would violate the Copyright Act's prohibition on reproduction and would exceed the scope of the license."

*MDY Indus.*, 629 F.3d at 940 (citation and internal quotations omitted).  Further, since a copyright owner must expressly grant the power to sublicense, *Ward,* 208 F. Supp. 2d at 443, it follows that express limitations on that right would be conditions.  Here, by using the RTS on multiple servers for more than a year American Express violated temporal and numerical limits imposed on sublicenses by sections 3.1.5 and 3.2.8 of the APA.  Since these limitations are grounded in Plaintiffs' exclusive right to control copying and distribution under 17 U.S.C. § 106, the disputed terms are conditions.

Furthermore, the consequences of a breached copyright condition extend to downstream

sublicensees since a sublicense that purports to grant rights not held by the sublicensor is *void ab initio*. *Gilliam*, 538 F.2d at 20-21; *Major League Baseball Promotion Corp. v. Colour-Tex, Inc.*, 729 F. Supp. 1035, 1042 (D. N.J. 1990). "[I]f the nature of the licensee's violation consists of a failure to satisfy a condition to the license . . ., it follows that the rights dependent upon satisfaction of such condition have not been effectively licensed, and therefore, any use by the licensee is without authority from the licensor and may therefore, constitute an infringement of copyright." *Reis, Inc. v. Spring11 LLC*, 15-CV-2836 (PGG)(JCF), 2016 WL 5390896, at *6 (S.D.N.Y. Sept. 26, 2016) (Gardephe, J.) (citations omitted). *Netbula, LLC v. Storage Technology Corp.*, 06-CV-7391 (MJJ), 2008 WL 228036 (N.D. Cal. Jan. 18, 2008), relied on by American Express (Def's Br. at 10), is inapposite. In that case, the distributor had a broad, "perpetual, irrevocable license to . . . sublicense . . . ." (*id*. *6) and the only relevant dispute was excess number of users. *Id*. Here, Section 2.1.1 of the APA does not mention sublicensing at all; those provisions of the APA that do provide only for annual, single-server sublicenses. *See* Section I, above. In short, because conditions of the APA were breached, the MLA is invalid, meaning Micro Focus has a copyright claim against American Express, not merely a breach of contract claim against Identex.

### B.    American Express's Attempt to Characterize the Limited Sublicensing Right as Merely Relating to Payment is Unsupported in Fact and Law

Knowing that contractual language grounded in the exclusive rights of a copyright owner are conditions, American Express tries a different tack in its motion, arguing that the APA's sublicensing language only relates to payment. American Express urges this construction because the right to royalties is not among the exclusive rights set out in Section 106, 17 U.S.C. § 106, and some courts have held that payment terms in software licenses are covenants. The plain language of the APA belies this latest attempt to avoid Micro Focus's claims.

### 1.    The Limited Sublicense Grant Does Not Merely Relate to Payment

If the parties had intended to make the issue only one relating to payments, they would have said so.  Yet the APA does more than that, clearly providing that Identex's right to issue sublicenses is limited to annual, single-server licenses.  In Paragraph 2.1, Micro Focus grants to Identex a non-exclusive license to market and distribute the RTS in conjunction with the IACE Application.  Drennan Decl. Ex. A at T&C ¶¶ 2.1.  To the extent that the APA gives Identex the ability to issue sublicenses, Paragraph 3.1.5 explicitly provides that copies of the RTS distributed by Identex, or by extension Firstlogic, must be subject to an end user license agreement that "limits the license granted to a per [server] license . . . and to an annual term."  *Id*. at T&C ¶¶ 3.1.5.  This is confirmed in Paragraph 3.2.8, which makes clear that Identex "may not . . . . "[o]btain or provide a license for the RTS other than an annually renewable license term."  *Id*. at T&C ¶ 3.2.8.  If American Express's position is accepted by the Court, these sections of the APA would be rendered totally superfluous in violation of English contract law.  Accordingly, American Express's attempt to characterize the annual-term, single-server restrictions as mere payment terms must fail.

### 2.    The Cases Cited by American Express Do Not Support the Argument that the Relevant APA Terms Are Covenants in Any Event

Ironically, even if the Court characterizes the limited sublicensing right in the APA as relating to payment, that does not help American Express either.  In most of the software cases cited by American Express, the court determined the terms at issue were covenants because the agreements contained language that set forth contingency plans for the licensee to pay for excess use, which is generally interpreted as meaning the licenses covered the use in question.  *See BroadVision, Inc. v. Med. Protective Co*., 08-CV-1478 (WHP), 2010 WL 5158129, at *2 (S.D.N.Y. Nov. 23, 2010) ("If an audit reveals that [Med Pro] has underpaid its total fees by

more than five percent (5%), then [Med Pro] shall pay BroadVision's reasonable costs of conducting the audit, in addition to the underpaid amount."); *Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*, 387 F. Supp. 2d 521, 534 (M.D.N.C. 2005) ("[i]f [Madison] exceeds the number of licenses purchased [,] [Madison] has 30 days to remit payment for the actual number of licenses used."); *Quest Software, Inc. v. DirecTV Operations, LLC*, 09-CV-1232 (AG)(ANx), 2011 WL 4500922, at *8 (C.D. Cal. Sept. 26, 2011) (agreement contained a "true-up" provision that allowed the licensee to exceed the maximum number of CPUs covered by the software license by paying additional fees); *Sun Microsystems, Inc. v. Microsoft Corp.*, 81 F. Supp. 2d 1026, 1032 (N.D. Cal. 2000) ("Section 11.2(d) gives either party a thirty day (30) period after notice to cure any material breach before the non-breaching party can exercise its sole remedy of seeking monetary damages.").  In contrast, the APA contains no contingency provisions that contemplate sublicenses exceeding the annual-term and server limitations, only language in section 4.7 relating to late payment of uses within the license.  This is because the license grant is *conditioned* on compliance with these restrictions.  The fact that American Express's cases largely involve licenses with contingency clauses destroys American Express's argument that the language and structure of the APA proves clauses 3.1.5 and 3.2.8 are covenants.[5]

Moreover, American Express' motion is premised on the idea that the APA is really two separate agreements: one broad license from Micro Focus to Identex set out in Section 2.1 and the contractual restrictions on that license, set out in Sections 3.1 and 3.2.  As shown above in

---

[5] Even if the contested provisions of the APA solely related to payment and provided for excess use – which they do not – the Court should still deny summary judgment in order to determine at trial whether the limitations on the license are conditions or covenants.  In *Accusoft*, the court denied on summary judgment that plaintiff's copyright infringement claim was barred by a licensing agreement containing a remedy provision to resolve excess use before payment.  2015 WL 10718481, at *23-24.  The court reasoned that the "tension" between the remedy provision and a license limitation clause presented "a question of fact as to whether, the limitation on the scope of the license is a covenant and not a condition."  *Id.*

Section II, this distinction violates English and U.S. principles of contract interpretation.  In any

event, to support its faulty argument, American Express misrepresents two opinions in *Sun*

*Microsystems, Inc. v. Microsoft Corp.*, a case in which the Ninth Circuit remanded the question

whether the disputed restriction in a software license agreement was a condition or a covenant

(188 F.3d 1115 (9th Cir. 1999) ("*Sun I*"), *implied overruling recognized by Perfect 10, Inc. v.*

*Google, Inc.*, 653 F.3d 976 (9th Cir. 2011)), and subsequently, the district court found covenants

in terms requiring that modifications to the licensed software meet compatibility standards for

use with third-party software programs (81 F. Supp. 2d 1026 (N.D. Cal. 2000) ("*Sun II*")).

     First, as the court in *Pacific Stock* noted, *Sun II* was decided before the Ninth Circuit

issued *MDY*, which permits copyright infringement claims for breaches of conditions "grounded

in an exclusive right of copyright."  927 F. Supp. 2d at 999 ("To the extent Pearson relies on the

district court's ruling in *Sun Microsystems* as requiring a breach of contract action when a

numerical limit in a license is exceeded, this court notes that *Sun Microsystems* was decided

before the Ninth Circuit issued its *MDY* decision.").  *MDY* clarified the Ninth Circuit's position

on the condition/covenant analysis, distinguishing between conditions grounded in exclusive

rights of copyright (a prohibition on the creation of derivative works of the video game at issue)

and covenants that prohibit conduct not related to copyright (contractual provision barring

interference with other players' gaming experiences).  *MDY Indus.*, 629 F.3d at 940.  The *MDY*

court specifically recognized limitations on the number of copies as a copyright-grounded

condition.  *Id.*; *infra* 18.  American Express's reliance on *Sun II* is therefore misplaced.

     Second, *Sun I* did not, as American Express represents, reject the argument that terms

appearing in separate sections could be read together to define the scope of the license, but

simply remanded on the basis that the district court must determine whether the disputed terms

are conditions or covenants.

Third, and most importantly, American Express ignores that *Sun II*'s analysis of the license agreement's language and structure centers on an extensive remedies provision that the parties agreed would resolve a breach of "any material term of this Agreement."  81 F. Supp. 2d at 1029.  Because of such a broad remedies provision, the *Sun II* court determined that the parties intended the software compatibility requirement to be a covenant affording only the specified remedies rather than a condition.  *Id.* at 1032 ("The remedies scheme set forth in section 11.2 fits logically with the parties' intent to treat the compatibility obligations as separate covenants and not as limitations on the scope of the pre-termination license grants of sections 2.1 and 2.2.")  The court's comment that the compatibility requirements did not contain conditional language, seized upon by American Express in its brief, was a minor consideration relative to the clear evidence that the parties intended the remedies provision to resolve breaches of *any* material terms.  Here, the APA contains no such remedies provision casting material terms as covenants or cabining the relief the parties may pursue.  The Court can and should read the relevant terms of the APA together to determine the scope and conditions of the right to grant sublicenses.  So doing reveals the fallacy of American Express's latest interpretation of the APA.

In sum, American Express is wrong to frame this case in terms of covenants and conditions when the decisive issue is the scope of the APA's sublicense grant, but Micro Focus would prevail under that standard as well.  The disputed prohibitions in the APA implicate Micro Focus's exclusive copying and distribution rights under the Copyright Act, qualifying these terms as conditions.  American Express's attempt to recast them as payment terms, and thus covenants, fails in light of other software license cases in which the courts interpreted the disputed terms as covenants because the agreements contained clauses providing for the

possibility of excess use.  Hence, these courts found the terms did not limit the scope of the

copyright licenses.  Since the APA contains no such contingency clause, these cases are at least

inapposite if not supportive of finding conditions in Paragraphs 3.1.5 and 3.2.8 of the APA.

## CONCLUSION

Throughout this case, American Express has proffered several contradictory rationales to

support its argument that Micro Focus's copyright infringement action is precluded.  None hold

when tested against the governing principles of English contract law, or as American Express

misguidedly argues, U.S. case law considering infringement claims based on use that contradicts

copyright license agreements.  Accordingly, Plaintiffs respectfully request that the Court deny in

full Defendant's motion for summary judgment and grant its concurrently filed cross-motion.

Dated: February 10, 2017
      New York, NY

Respectfully submitted,

FROSS ZELNICK LEHRMAN & ZISSU, P.C.

By: _____
    James D. Weinberger (jweinberger@fzlz.com)
    Jessica Vosgerchian (jvosgerchian@fzlz.com)
4 Times Square, 17th Floor
New York, New York 10036
Tel:  (212) 813-5900
Fax:  (212) 813-5901

Stuart M.G. Seraina (sseraina@kg-law.com)
   (admitted *pro hac vice*)
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
Tel:  (410) 752-6030
Fax:  (410) 539-1269

*Attorneys for Plaintiffs/Counterclaim-Defendants*