**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICRO FOCUS (US), INC. and MICRO FOCUS IP DEVELOPMENT LIMITED, <br><br> *Plaintiffs/Counterclaim-Defendants*, <br><br> v. <br><br> AMERICAN EXPRESS COMPANY, <br><br> *Defendant/Counterclaim-Plaintiff.* | No. 1:15-CV-07438-PGG <br><br> **ORAL ARGUMENT REQUESTED** |

**DEFENDANT AMERICAN EXPRESS COMPANY'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION**
**FOR SUMMARY JUDGMENT REGARDING THE SCOPE OF THE LICENSE**
**GRANTED IN THE MICRO FOCUS APPLICATION PROVIDER AGREEMENT**

David J. Wolfsohn (admitted *pro hac vice*)
Aleksander J. Goranin (admitted *pro hac vice*)
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103-4196
Tel:    (215) 979-1000
Fax:    (215) 979-1020

Brian D. Siff (#2435394)
DUANE MORRIS LLP
1540 Broadway
New York, New York 10036-4086
Tel:    (212) 692-1000
Fax:    (212) 692-1020

*Counsel for Defendant/Counterclaim-Plaintiff*
*American Express Company*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STATEMENT OF UNDISPUTED FACTS ........................................................................5

ARGUMENT ......................................................................................................................7

I.      The Parties Do Not Dispute that the APA Licensed Identex (and Firstlogic) to
Distribute the RTS Software ....................................................................................8

II.     Micro Focus' "Per Server" and "Annual Term" Provisions are *Not* Conditions
Limiting the Scope of Identex's Distribution License ..........................................10

       A.     T&C §§ 3.1.5 and 3.2.8 are Not Conditions Restricting License Scope ..............12

              1.     The APA's structure and language demonstrate that the "per
server" and "annual term" provisions are *not* conditions limiting
the distribution license ............................................................................13

              2.     Courts in analogous software licensing cases have repeatedly
decided that payment-related terms are *not* conditions on license
grants........................................................................................................17

              3.     To the extent there is ambiguity, common law contract principles
teach *against* construing the terms as conditions......................................21

       B.     Paragraph 2 of the Cover Letter Cannot Be Construed as a Condition
Because the APA's Conflicting Terms & Conditions Override It........................23

III.    The Conclusory Views of Micro Focus' UK Law Expert Do Not Create Genuine
Issues of Material Fact ...........................................................................................24

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Federal Cases**

*Apple Mortgage Corp. v. Barneblatt*,
   162 F. Supp. 3d 270 (S.D.N.Y. 2016)....................................................................7

*Bourne v. Walt Disney Co.*,
   68 F.3d 621 (2d Cir. 1995)..............................................................................11

*British Int'l Ins. Co. v. Seguros La Republica, S.A.*,
   2000 WL 713057 (S.D.N.Y. 2000)................................................................24-25

*BroadVision, Inc. v. Medical Protective Co.*,
   2010 WL 5158129 (S.D.N.Y. Nov. 23, 2010).......................................... 11, 19-21

*Choice-Intersil Microsystems, Inc. v. Agere Systems*,
   2004 WL 792387 (E.D. Pa. Apr. 12, 2004) ..................................................17

*Faggionato v. Lerner*,
   500 F. Supp. 2d 237 (S.D.N.Y. 2007)..........................................................24-25

*Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.*,
   661 F.2d 479 (5th Cir. 1981) ...........................................................................8

*Graham v. James*,
   114 F.3d 229 (2d Cir. 1998).............................................................................11

*Graham v. James*,
   144 F.3d 229 (2d Cir. 1998).................................................................... *passim*

*Jacob Maxwell, Inc. v. Veeck*,
   110 F.3d 749 (11th Cir. 1997) .........................................................................22

*Madison River Management Co. v. Business Management Software Corp.*,
   387 F. Supp. 2d 521 (M.D.N.C. 2005) ......................................................18-21

*MDY Indus. v. Blizzard Entertainment, Inc.*,
   629 F.3d 928 (9th Cir. 2010) ...............................................................11, 22-23

*Netbula, LLC v. Storage Technology Corp.*,
   2008 WL 228036 (N.D. Cal. Jan. 18, 2008)....................................... *passim*

*PaineWebber, Inc. v. Bybyk*,
   81 F.3d 1193 (2d Cir. 1996)............................................................................7

*Quest Software, Inc. v. DirectTV Operations*,
   2011 WL 4500922 (C.D. Cal. Sept. 26, 2011) ......................................11, 20-21

*Sun Microsystems, Inc. v. Microsoft Corp.*,
   81 F. Supp. 2d 1026 (N.D. Cal. 2000) ............................................................. 13-14

*Sun Microsystems v. Microsoft Corp.*,
   188 F.3d 1115 (9th Cir. 1999) ...........................................................9, 11, 13

*U.S. Naval Institute v. Charter Comm'ns, Inc.*,
   936 F.2d 692 (2d Cir. 1991)...........................................................9, 12, 14

**Federal Statutes and Rules of Court**

17 U.S.C. § 504(b) ............................................................................................18

Fed. R. Civ. P. 44 ...........................................................................................24-25

Fed. R. Civ. P. 56 ....................................................................................1-2, 5, 5, 8

**Other Authorities**

Black's Law Dictionary (8th ed. 1999)..........................................................14, 21

8 Corbin on Contracts § 30.12 (2016) ...............................................................21

9A Fed. Prac. & Proc. Civ. § 2444 .....................................................................25

Restatement (Second) Contracts §227 ...........................................................22, 23

## **INTRODUCTION**

The parties' cross motions for summary judgment turn on a question of contract interpretation: Is the scope of the license Micro Focus granted to Identex in their 2004 agreement — the Micro Focus Application Provider Agreement ("APA") — restricted in the manner Micro Focus contends it is?  This issue is important because, in this lawsuit, Micro Focus has elected to sue only an innocent end user of its software, American Express, for copyright infringement.  And copyright precedent unambiguously teaches that only conduct *outside* the scope of a granted license permits a copyright holder to maintain a cause of action for copyright infringement.  But that is not the case here.  As shown below, Micro Focus granted a broad software distribution license to Identex.  To the extent that American Express' use of that software went beyond the promises Identex made about what end users would do, then Micro Focus' only claim, if it has one, is for breach of contract against Identex.

Micro Focus has built its case on the assertion that the APA license was conditioned and limited in scope.  Thus, the parties do not dispute that a relevant license exists (the license set forth in the APA), but they dispute the boundaries of that license.  In such circumstance, "when the contested issue is the *scope* of a license, rather than the *existence* of one," the law is clear that "the copyright owner" — Micro Focus — "bears the burden of proving that the defendant's copying was unauthorized under the license."  *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998).  Micro Focus has not met that burden.  Its position on the scope of the APA license fails as a matter of contract interpretation, which is a question of law for the Court.  Nor can Micro Focus credibly argue the existence of disputed factual issues bearing on the relevant APA license terms.  Thus, because there are no disputed issues of material fact, and Micro Focus' contractual interpretation is wrong as a matter of law, summary judgment regarding the scope of the APA's license is appropriate.  *See* Fed. R. Civ. P. 56 (a) (summary judgment on each "claim or defense"

or "part of each claim or defense" is granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law").

In its Second Amended Complaint and later Court submissions (*e.g.*, Dkt. # 67), Micro Focus asserts that the license granted to Identex was circumscribed in two ways.  First, Micro Focus argues that the APA does not authorize Identex to permit end users like American Express to install the Micro Focus RTS software on more than one computer server; Micro Focus refers to this as the "per server" limitation.  (*See, e.g.*, Dkt. # 67 at 2-3).  Second, Micro Focus contends that the APA does not authorize Identex to permit end users to use the software for more than one year; Micro Focus calls this the "annual license" or "annual term" limitation.  (*Id.*).

As a matter of contract interpretation, however, neither of these terms is a *condition* that limits the scope of the license granted to Identex under the APA.  At most, these are contractual terms concerning *Identex's* license-fee payment obligations to Micro Focus, defining how Identex's payments will be calculated (*i.e.*, a fee for each computer server on which the end user installs the software) and how Identex's payments will be timed (*i.e.*, paid annually).  And because nothing in the APA requires that Identex make these license-fee payments *before* distributing Micro Focus' software — to the contrary, the APA explicitly provides for Identex's distribution to occur first, followed by reporting of the distribution and payment of the applicable fees thereafter — the "per server" and "annual licenses" terms cannot be *conditions* limiting Identex's rights to distribute copies of the RTS software to end users like American Express.

Indeed, in at least four copyright software licensing cases (including one in this District), courts have faced strikingly similar fact patterns and have consistently held that payment-related terms are not *conditions* limiting the scope of distribution licenses like the one in the APA; instead, these courts held that the owner's proper remedy is to sue for breach of contract.  *See* Argument

§ II.A.2 below.  In this case, that would mean suing *Identex*, because that is Micro Focus'
counterparty to the APA and is the *sole* party obligated to make license payments to Micro Focus
under that agreement.  (The APA expressly provides that Identex does *not* have to pass through
those fees to end users like American Express and is "entirely free to determine the actual prices at
which [it] will distribute the Software Products" to customers.  *See* Appendix to Rule 56.1(a)
Statement ("App'x") Ex. 1, APA at MIFO0000005 T&C § 4.8).[1]

At bottom, Micro Focus's claim is that it was not paid the full amount of the license fees
arguably owed under the APA, calculated on a "per server" and "annual" basis.  But under the
APA's unambiguous terms, that payment obligation rests *solely* on Identex, and was never a
condition precedent to Identex's ability to distribute copies of Micro Focus' RTS software to end
users like American Express.  For whatever reason — perhaps to avoid filing suit overseas against
Identex's U.K.-based successor, perhaps to claim more powerful copyright damages, such as
disgorgement of infringer profits, not available under contract damages law — Micro Focus
framed its case as one of copyright infringement against an end user.  But convenience in filing
suit or the desire for a bigger payday are no reason to construe the software distribution license
granted to Identex as being limited in ways it never was.

Micro Focus' interpretation of Identex's license rests on a fundamental error.  Micro
Focus disregards the fact that the APA, at its core, is a *distribution* agreement.  By design, the
APA contemplates that Identex (and by extension Firstlogic, its contractually appointed "dealer")
will disseminate copies of Micro Focus' RTS software widely.  In fact, the more copies

---

[1]     Throughout this brief, citations to "App'x Ex. __" are to the exhibits submitted as part of
the Appendix to the Local Rule 56.1(a) Statement, filed concurrently herewith. Citations to the
"APA" are to the Application Provider Agreement produced by Micro Focus, submitted as
Exhibit 1 in American Express' Appendix.  Citations to "T&C" are to the "Terms and
Conditions" section of the APA (MIFO0000004-0000007).

distributed by Identex, the better, since greater distribution translates into a greater payment stream to Micro Focus. The APA does not restrict end users like American Express to installing the RTS software on only one computer server and for only one year in absolute fashion; rather, the APA contemplates that if an end user *were* to install a copy on more than one server, and to use it for more than one year, *Identex* — not the end user — would owe Micro Focus an additional payment for each server and for each additional year.

As set forth below, there are at least three compelling reasons to reject Micro Focus' position that the "per server" and "annual license" terms are conditions limiting the scope of the Identex's software distribution license. *First*, the structure, purpose, and language of the APA make it abundantly clear that the "per server" and "annual license" terms arise from the definition of *Identex's* license-fee payment obligations and are not tied to the distribution license grant — which is set forth in an entirely separate section of the APA, T&C § 2.1.1. *Second*, as noted, numerous software copyright licensing cases have held in analogous fact patterns that payment-related terms like the ones at issue are *not* conditions restricting the scope of the license. *Finally*, construing the "per server" and "annual license" terms as conditions on the license grant conflicts with common-law contract principles teaching that imposing conditions is disfavored and should be avoided in cases of ambiguity.

For these reasons, this Court should enter summary judgment holding that, as a matter of contract interpretation, Micro Focus' "per server" and "annual license" terms are *not* conditions restricting the scope of the license Micro Focus granted to Identex (and its downstream end users) under the APA.  Moreover, because Micro Focus has not presented any theory in support of its copyright infringement claim beyond its "per server" and "annual license" contentions, summary judgment should also be granted against the complaint in its entirety.

## STATEMENT OF UNDISPUTED FACTS[2]

In 2004, Micro Focus and a U.K. company named Identex Limited entered into the APA. (SMUF ¶¶ 10, 28). The APA authorizes Identex to distribute two categories of Micro Focus software products: (1) "Development Software" and (2) "RTS" products, with "RTS" standing for "runtime system." (SMUF ¶ 11). "Development Software" under the APA includes the Micro Focus "Server Express" software, which is referenced in Micro Focus' complaint but is not relevant to the issues raised in this motion. (SMUF ¶ 11). Instead, the parties directed their arguments to the Micro Focus "RTS" product, which in this case is the "Application Server for Server Express" software discussed in the Second Amended Complaint. (SMUF ¶¶ 7-13; Dkt. # 67 at 1). The RTS software acts as a type of translator, permitting applications written in an antiquated programming language, COBOL, to run on specific types of computer operating systems, *i.e.*, Unix-based machines. (SMUF ¶ 27; Dkt. # 67 at 1).

Most relevant to this motion is the fact that Micro Focus in the APA authorized Identex — referred to as "Application Provider" in the contract — to distribute copies of the RTS software to end-user customers, so long as the copies were distributed for use with Identex's IACE software product. (SMUF ¶¶ 29-30, 40-41). The IACE software cleanses and standardizes international addresses stored in databases; "IACE" stands for "International Address Cleansing Engine." (SMUF ¶¶ 23, 26; Dkt. # 67 at 1). Under the APA, Identex owes Micro Focus a "Per Copy License Fee" for each computer server on which a customer installs its copy of the RTS, and this "Per Copy License Fee" is payable annually ("per annum"). (SMUF ¶¶ 43-45).

The APA also appoints Firstlogic, Inc. as Identex's "Dealer" with respect to the RTS

---

[2] This section summarizes the key undisputed facts set forth in the accompanying Local Civil Rule 56.1(a) Statement of Material Undisputed Facts ("SMUF"), filed concurrently herewith. Additional detail and citations to the supporting record can be found therein.

software.  (SMUF ¶ 32).  As a "Dealer," Firstlogic is expressly authorized, on behalf of Identex, to distribute copies of the RTS to end users, again for use only with Identex's IACE address cleansing software.  (SMUF ¶¶ 29, 32).  Firstlogic bundled IACE as one of the modules in its "Global Information Quality Suite."  (SMUF ¶¶ 17, 23).

In 2004, American Express licensed the entire Global Information Quality Suite from Firstlogic.  (SMUF ¶ 18).  This transaction was governed by a "Master License Agreement" between Firstlogic and American Express, which covers the entire Global Information Quality Suite.  (SMUF ¶ 18).  The Master License Agreement references IACE as a component of the suite, but does not reference the Micro Focus RTS.  (SMUF ¶¶ 20-24).  Micro Focus has never argued that American Express violated any term of its license agreement with Firstlogic.

This dispute originated in 2013, when Micro Focus contacted American Express to investigate two separate licenses (under different license numbers) that American Express had obtained directly from Micro Focus, licenses that are not at issue here.  (SMUF ¶¶ 1-2).  In responding to Micro Focus' inquires, American Express noted that Micro Focus' Application Server for Server Express software (*i.e.,* the "RTS" referenced in the APA) was part of American Express' "Firstlogic" application.  (SMUF ¶ 2).  After ensuing discussions between Micro Focus and American Express stalled, Micro Focus filed this suit.  (SMUF ¶¶ 2-4).  The suit only states claims for copyright infringement against American Express, on the theory that American Express ran the RTS software on more than one computer server without paying the full annual license fees owed; both of these activities, according to Micro Focus, fell outside the scope of the original license grant to Identex in the APA.  (SMUF ¶¶ 9-15; Dkt. # 67 at 2-3).

Overall, the APA has four main parts containing terms relevant to the contract dispute:

1. a one-page cover letter, identified as page MIFO0000001 in the copy of the APA that Micro Focus produced in discovery (SMUF ¶ 35)

2.    the Terms and Conditions section, MIFO0000004-0000007 (SMUF ¶ 36)

3.    Exhibit 1 to the Terms and Conditions, MIFO0000002-0000003 (SMUF ¶ 37)

4.    Appendix A, which is a copy of a "Micro Focus End User Software License Agreement Current on the Effective Date," MIFO0000008-0000013 (SMUF ¶ 38)

The parties do not dispute that American Express received a copy of the RTS in conjunction with Identex's IACE module under the Master License Agreement with Firstlogic.  (SMUF ¶ 25).  But there is no evidence in the record that American Express ever received a copy of the Appendix A end user license agreement ("EULA"), or any Micro Focus EULA. (SMUF ¶¶ 59-62).

## ARGUMENT

The issue presented in this motion is one of pure contract interpretation, regarding the proper scope of the license Micro Focus granted to Identex under the APA.  As the Court observed earlier this year, the "focus [is] on the application provider agreement and what rights it does or does not cover."  (App'x Ex. 11, May 12, 2016 Conf. Tr. at 5:23-6:3).  Contract interpretation "is a matter of law for the court to decide" and may be decided on summary judgment.  *Apple Mortgage Corp. v. Barneblatt*, 162 F. Supp. 3d 270, 281 (S.D.N.Y. 2016); *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996).

Section 6.7.1 of the APA's Terms and Conditions states that "the laws of England" apply to the "construction" of the APA.  (App'x Ex. 1, APA at MIFO0000006).  However, although Micro Focus requested and obtained "expert testimony relating to English contract law" (Dkt. # 81), its expert did not identify any relevant difference between U.K. principles of contract interpretation and U.S. principles.  (App'x Ex. 14, Sir Robin Jacob Expert Disclosure, at ¶¶ 17-31).  In fact, Micro Focus previously told the Court that "U.K. law shares with American law fundamental principles of contract interpretation."  (Dkt. # 67 at 2).  Micro Focus' expert also did not opine that U.K. law would treat the analysis of whether a term is a "condition" limiting the scope of a license any differently than would U.S. federal copyright law or state contract law.

7

(*Id.*).[3]  Thus, the Court has before it a question of law regarding contract interpretation and no material factual disputes about any extrinsic evidence relevant to that question.[4]  In such circumstance, when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment should be entered.  Fed. R. Civ. P. 56(a).

## I.    The Parties Do Not Dispute that the APA Licensed Identex (and Firstlogic) to Distribute the RTS Software

Any analysis of the scope of the license granted under the APA must start with § 2.1.1 of the Terms & Conditions — explicitly titled "LICENCE GRANT" and subtitled "Non-exclusive Licence."  (APA at MIFO0000004).[5]  Section 2.1.1 expressly grants Identex, the "Application Provider," the right to "market and distribute to Application Provider's customers…copies of RTS products manufactured by Micro Focus."  (APA at MIFO0000004, emphasis added).[6]

---

[3]    Moreover, to the extent English law conflicts with U.S. copyright policy, U.S. copyright law applies.  *See, e.g.*, *Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.*, 661 F.2d 479, 483 (5th Cir. 1981) (holding that U.S. copyright law will govern when the "application of particular state rules of construction would so alter rights granted by the copyright statutes as to invade the scope of copyright law or violate its policies").

[4]    In fact, Micro Focus' U.K. law expert took the position that "[t]he parties' subjective intentions as to what they meant are irrelevant and evidence about such intentions is inadmissible" and that "the actual negotiations between the parties [are] likewise inadmissible." (App'x Ex. 14, Expert Disclosure of Sir Robin Jacob, at 4 ¶¶ 18.c-18.d).  Moreover, even if admissible, Micro Focus admits it has no employees remaining who were involved in the actual negotiations over the APA.  (App'x Ex. 15, Decl. of Susan Brennan, at ¶ 2).

[5]    All citations to the "APA" are to the copy of the Application Provider Agreement produced by Micro Focus in discovery, submitted as App'x Ex. 1.  The APA alternates between American and British spellings of "license."  The American spelling is used in this brief, unless directly quoting from a British spelling in the APA.

[6]    The relevant license grant language in § 2.1.1 is in full as follows; the license grant language in § 2.1.2 concerns "Development Software" and is irrelevant to Micro Focus' infringement claims in this case:

2. LICENSE GRANT
2.1    Non-exclusive Licence. Micro Focus hereby grants Application Provider a personal, non-exclusive, non-transferable licence to:
2.1.1    market and distribute to Application Provider's customers ("Application Provider Customer(s)") for use with Application Provider's own Application object code copies of RTS products manufactured by Micro Focus and delivered to

This distribution license to Identex is conditioned on the RTS copies being distributed "for use with Application Provider's own Application object code," in other words, with Identex's IACE product.  There is no dispute that this condition was satisfied.  (Dkt. # 67 at 1-2).  Micro Focus also does not contest that American Express received its copy of Micro Focus' RTS software in conjunction with Identex's IACE address cleansing software, which was being distributed by Firstlogic acting as Identex's "Dealer" under the APA.  (SMUF ¶ 25).[7]  Put another way, Micro Focus does not dispute that Micro Focus' RTS software was distributed to American Express pursuant to the APA's § 2.1.1 distribution license granted to Identex.  (Dkt. # 67 at 1-2; App'x Ex. 11, May 12, 2016 Conf. Tr. at 5:23-6:3).

The existence of this § 2.1.1 software distribution license would immunize *both* Identex (the authorized distributor of software copies) *and* American Express (the customer using the distributed copies) from charges of copyright infringement.  As the Second Circuit succinctly put it, a "copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement" and can sue only for breach of contract. *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998); *Sun Microsystems v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999) ("*Sun I*") (same).[8]

---

Application Provider in pre-packaged form by Micro Focus and which are identified in Exhibit 1.

[7]    As noted above, § 5 of Exhibit 1 of the APA explicitly appoints Firstlogic as Identex's "Dealer," with the power to "market[ ] and distribut[e]" "copies of the RTS" "directly to end users."  (APA at MIFO0000002-3 Ex. 1 § 5).  However, the contract also makes clear that each such distribution will be "deemed" to have been made by Identex, with Identex assuming all responsibility for the distribution "including…payment of Per Copy License Fees."  (*Id.*).  Because nothing in this case turns on the distinction between Identex and Firstlogic, this brief will generally refer to both as "Identex."

[8]    *See also U.S. Naval Institute v. Charter Comm'ns, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991) ("an exclusive licensee of any of the rights comprised in the copyright, though it is capable of breaching the contractual obligations imposed on it by the license, cannot be liable for infringing the copyright rights conveyed to it.").

Notably, an upstream software distribution license *also* protects downstream customers using the distributed software, as illustrated by *Netbula, LLC v. Storage Technology Corp.*, Civ. 06-07391, 2008 WL 228036 (N.D. Cal. Jan. 18, 2008).  There, in language paralleling § 2.1.1 of the APA, copyright holder Netbula granted distributor StorageTek "Distribution Licenses," specifically "a non-exclusive, perpetual, irrevocable license to copy, sublicense, transfer and distribute the NETBULA RPC Supporting Programs…along with StorageTek's product to StorageTek's resellers and customers."  *Id.* at *6.  StorageTek, however, "distributed more copies of Netbula's Supporting Programs than it paid for," prompting Netbula to sue both StorageTek *and* its customers for copyright infringement, arguing that the customers' excess use fell outside the scope of StorageTek's "Distribution Licenses."  *Id.* at *7.  The court first held — in reasoning further described below, and fully applicable to this case — that StorageTek's license was *not* limited by a condition requiring payment for excess use outside the numerical limits on the license.  *Id.* at *8.  Notably, the court then held that StorageTek's *customers* were *also* protected by these upstream "Distribution Licenses" for the same reason: "Plaintiff sued StorageTek customers IBM, EMC and Darden based on their use of StorageTek's LibAttach products….Since StorageTek's distribution of the Supporting Programs was within the scope of StorageTek's Distribution Licenses, the customers' use of those products was not infringing."  *Id.* at *8.

*Netbula*'s logic applies with equal force to this case.  Unless Micro Focus can demonstrate that § 2.1.1's license was conditioned and limited in the "per server" and "annual term" manner Micro Focus alleges — which it cannot — Identex's distribution license also shields American Express, as a user of the Identex-distributed RTS software, from claims of infringement.

## II.   Micro Focus' "Per Server" and "Annual Term" Provisions are *Not* Conditions Limiting the Scope of Identex's Distribution License

To prevail, Micro Focus must demonstrate that Identex was not authorized under the APA

to distribute RTS copies to a customer unless the customer adhered to the alleged "per server" and "annual term" provisions.  Because this is an argument about the *scope* of the license granted, not about the license's *existence*, Micro Focus "bears the burden of proving that the defendant's copying was unauthorized under the license" and "that the allegedly infringing acts were not allowed by the license."  *Graham v. James*, 114 F.3d 229, 236 (2d Cir. 1998); *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).  "[B]efore [Micro Focus] can gain the benefits of copyright enforcement, it must definitively establish that the rights it claims were violated are copyright, not contractual, rights."  *Sun I*, 188 F.3d at 1122.

Copyright cases "refer to contractual terms that limit a license's scope as 'conditions,' the breach of which constitute copyright infringement" — as distinguished from promissory terms under which one of the parties undertakes a duty or obligation to its counterparty.  *MDY Indus. v. Blizzard Entertainment, Inc.*, 629 F.3d 928, 939 (9th Cir. 2010); *see generally* Nimmer on Copyright § 10.15[A][2] (distinguishing between "failure to satisfy a condition to the grant" as compared to "a breach of a covenant").  As courts in the Second Circuit explain, "[w]hether a licensee has acted outside the scope of the license depends on whether the terms of the license were covenants or conditions."  *BroadVision, Inc. v. Medical Protective Co.*, Civ. 08-1478-WHP, 2010 WL 5158129, at *3 (S.D.N.Y. Nov. 23, 2010).  Only "if the nature of the licensee's violation consists of a failure to satisfy a condition to the license" can "use by the licensee . . . constitute an infringement of copyright."  *Graham*, 144 F.3d at 237; *BroadVision*, 2010 WL 5158129, at *3.[9]

---

[9]     *Accord Quest Software, Inc. v. DirectV Operations*, Civ. 09-1232, 2011 WL 4500922, at *4 (C.D. Cal. Sept. 26, 2011) (to "prove that a licensee acted outside the scope of a license, the licensor 'must demonstrate that the violated term…is a condition rather than a covenant' under state contract law and federal copyright law.").

Micro Focus points to three main clauses in the APA as ostensibly imposing "per server" and "annual license" conditions restricting the scope of § 2.1.1's distribution license: §§ 3.1.5 and 3.2.8 of the Terms & Conditions and ¶ 2 of the cover letter.  None of these clauses, however, impose conditions; at most, they reflect promises made or obligations undertaken by Identex relating to its payment of a "Per Copy License Fee" to Micro Focus — violation of which by Identex cannot give rise to a copyright infringement action, especially against end user American Express.  *See, e.g.*, *U.S. Naval Institute v. Charter Communications*, 936 F.2d 692, 695 (2d Cir. 1991) ("[A]n exclusive licensee of any of the rights comprised in the copyright, though it is capable of breaching the contractual obligations imposed on it by the license, cannot be liable for infringing the copyright rights conveyed to it."); *Netbula,* 2008 WL 228036, at *8.

### A.    T&C §§ 3.1.5 and 3.2.8 are Not Conditions Restricting License Scope

Section 3.1.5 of the APA's Terms and Conditions, states in relevant part:

> 3.      <u>APPLICATION PROVIDER OBLIGATIONS</u>
> 3.1     Application Provider agrees that:
> 3.1.5.  copies of the RTS distributed by Application Provider will be subject to an end user license agreement between Application Provider and Application Provider's customer which (i) is no less protective of Micro Focus' proprietary rights and business interests than the then current Micro Focus End User Software Licence Agreement, a current copy of which, on the Effective Date, is included in Appendix A hereto; and (ii) limits the license granted to a per CPU license (as defined in such Micro Focus End User Software Licence Agreement save that references to 'CPU' shall be replaced by references to 'server') and to an annual term (subject to earlier termination as provided therein).

(APA at MIFO0000004).  Clause 3.2.8 of that same section states that "Application Provider may not…[o]btain or provide a licence term for the RTS other than an annually renewable license term."  (*Id.*).  As shown below, however, these clauses are *not* properly construed as conditions limiting the scope of § 2.1.1's distribution license because of (1) the structure and language of the APA as a whole, (2) a consistent line of software copyright cases holding that strikingly similar license terms were *not* conditions, and (3) standard, established common law principles

disfavoring contractual conditions.

**1.** **The APA's structure and language demonstrate that the "per server" and "annual term" provisions are *not* conditions limiting the distribution license**

To decide whether a term is a condition limiting license scope, analogous software licensing cases have examined *inter alia* the "language and structure" of the agreement. *Sun Microsystems, Inc. v. Microsoft Corp.*, 81 F. Supp. 2d 1026, 1032 (N.D. Cal. 2000) ("*Sun II*"). Here, the APA's language and structure, when read as whole, compel the conclusion that these terms should *not* be classified as conditions, for at least three reasons.

**a.** **The provisions do not appear in § 2.1.1's license grant**

*First*, it is important that Micro Focus' "per server" and "annual term" provisions are located in an entirely *separate* section of the APA — § 3, titled "<u>APPLICATION PROVIDER OBLIGATIONS</u>" — than § 2.1.1's distribution license, which appears in the section headed "<u>LICENSE GRANT</u>." (APA at MIFO0000004). When restrictive terms appear in a section that is separate from the license grant itself, courts rely upon such separate and distinct placement as a reason for concluding that those restrictive terms are *not* conditions on the license grant. For example, much like Micro Focus in this case, Sun Microsystems in *Sun I* argued that certain technological "compatibility terms" found in § 2.6 of a Technology License and Distribution Agreement "must be read together" with the grant of a distribution license appearing in a separate section ("the granting language of section 2.2") "to create a license that grants Microsoft only the right to make *compatible* modifications." *Sun I*, 188 F.3d at 1121.[10]

The Ninth Circuit rejected that argument, *id.* at 1122-23, and then, on remand, the district

---

[10]    The language of the distribution license in *Sun I* is strikingly similar to § 2.1.1's distribution license in this case: "Sun granted Microsoft a non-exclusive license to… 'make, use, import, reproduce, license, rent, lease, offer to sell, sell or otherwise distribute to end users as part of a Product…the Technology and Derivative Works thereof in binary form.'" *Sun I*, 188 F.3d at 1118.

court held that § 2.6 did *not* state conditions restricting § 2.2's license scope, emphasizing that the terms were distinct and placed separately from the license grant in the agreement: "The language and structure of the TLDA suggest that the compatibility obligations are separate covenants or conditions of, or restrictions on, the license grants." *Sun II*, 81 F. Supp. 2d at 1032.  Moreover, the § 2.2 license grant said "nothing about the license grants being subject to, conditional on, or limited by compliance with the compatibility obligations set forth in Section 2.6." *Id.*[11]

The separate nature of § 2.1.1 and §§ 3.1.5 and 3.2.8 of the APA is indistinguishable from the distinct nature of § 2.2 and § 2.6 emphasized in *Sun II*.  Just as in *Sun II*, nothing in the language of § 2.1.1's license grant indicates that the distribution license there is "subject to, conditional on, or limited by" the "per server" and "annual term" provisions of §§ 3.1.5 and 3.2.8.  Moreover, those latter terms appear in an 18-paragraph list of "<u>APPLICATION PROVIDER OBLIGATIONS</u>" starting with the phrase "Application Provider agrees that" (in § 3.1) or "Application Provider may not" (in § 3.2).  These are manifestly the words of *promise* and *contract*, not of a condition restricting the scope of a license grant.  *See e.g.*, Black's Law Dictionary (8th ed. 1999) at 1104 (defining "obligation" as "[a] formal, binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp., a duty <u>arising by contract</u>") (emphasis added).

### b.     The provisions are directly tied to the payment terms in Ex. 1 § 2

*Second,* the "per server" and "annual term" concepts in §§ 3.1.5 and 3.2.8 do not appear in isolation, but instead flow from — and are directly tied to — Identex's license payment obligations to Micro Focus, as set forth in Exhibit 1 to the APA.  Section 2 of that exhibit defines the "Per

---

[11]     *See also U.S. Naval Institute v. Charter Communications*, 936 F.2d 692 (2d Cir. 1991) (holding that a clause regarding the timing of book publication set forth in ¶ 4 of a publishing agreement did not restrict the scope of the publication license granted in ¶¶ 1-2).

Copy License Fee for the RTS" in the very "per annum" and "per server" terms Micro Focus now emphasizes — the fee for a non-test copy of the RTS, for example, is "Seven Hundred and Fifty UK <u>per annum</u> (£750)** <u>per server</u>."  (APA at MIFO0000002 Ex. 1 § 2, emphasis added).

Moreover, Exhibit 1 § 2 makes clear that *Identex* — not an end-user customer like American Express — is ultimately responsible to Micro Focus for payment of these "per server" "per annum" fees.  The "Per Copy License Fee [is] payable <u>by Application Provider</u> for each server" — not by end-user customers or anyone else.  (*Id.*, emphasis added).  Indeed, under § 4.8 of the Terms & Conditions, end users need not pay anything at all for use of the RTS because Identex "is entirely free to determine the actual prices at which Application Provider will distribute the Software Products…."  (APA at MIFO0000005).  Identex is under no obligation to pass through any part of the "per server" and "per annum" fees to end users.

The APA also makes Identex fully and ultimately responsible for paying Micro Focus the license fees on any RTS software distributions made by Identex's "Dealer," Firstlogic.  According to Exhibit 1 § 5, any "copies of the RTS … distributed by Firstlogic pursuant to this section 5 are deemed to have been distributed by Application Provider for the purposes of this Agreement including without limitation…payment of Per Copy License Fees."  (APA at MIFO0000002-3).  Identex "shall at all times be responsible for the observance of this Agreement by Firstlogic and shall indemnify Micro Focus and hold it harmless from any action by Firstlogic which causes a breach of this Agreement."  (*Id.*).

The organizing principle behind all these provisions is clear: The "per server" and "per annum" concepts Micro Focus relies upon define the license fee payment obligations that Identex — and *only* Identex — ultimately owed to Micro Focus.  These terms specify *when* Identex was to make payment ("per annum" or annually) and *how* that payment was to be calculated (a fee

"per server" for each computer server on which a customer installed a copy of the RTS).  Notably, however, and explained further below (*see* § II.A.2), nothing in the APA requires Identex to make those payments *before* distributing RTS copies to customers — in other words, as a condition to making a software distribution under § 2.1.1.  To the contrary, § 4.5 of the Terms & Conditions specifically contemplated that Identex would provide quarterly reports to Micro Focus *after* the fact, identifying RTS distributions already made.  *See* APA at MIFO0000005 § 4.5 (referring to "written report[s] to Micro Focus regarding such distribution at the end of each quarter").  Moreover, if Identex were late in paying the applicable fees, the APA provided Micro Focus with protection in that scenario as well — Identex would be obligated to pay an interest rate of 1.5% "per month" until the amount owed was "paid in full."  (*Id.* § 4.7).

In short, nothing in the APA suggests that the "per server" and "annual term" restrictions are an absolute bar on how widely Identex's customers could install their RTS copies or how long those copies could be used.  To the contrary, just like the payment terms that were held *not* to state conditions in the analogous cases below (*see* § II.A.2), the "per server" and "annual term" provisions in the APA, fairly read, simply mean that *if* customers were to make an excess use, Identex would be obligated to pay Micro Focus for that use.  Micro Focus' remedy is against Identex, not against end-user customers like American Express, to whom Identex was perfectly free to charge *no* license fee for use of the RTS at all.  (APA at MIFO0000005 § 4.8).

### c.     The other clauses in § 3 cannot be construed as conditions

*Finally*, if §§ 3.1.5 and 3.2.8 do in fact state conditions restricting the scope of § 2.1.1's license grant, Micro Focus offers no credible explanation as to why those conditions were *not* listed in the § 2.1.1 "<u>LICENCE GRANT</u>" itself.  After all, other conditions on Identex's distribution license are quite clearly stated in the body of § 2.1.1, such as the condition that the RTS products distributed must be "manufactured by Micro Focus," must be obtained by Identex

"in pre-packaged form," and can only be distributed "for use with" IACE, "Application Provider's own Application object code."  (APA at MIFO0000004 § 2.1.1).  Had Micro Focus wished to make the "per server" and "annual term" provisions conditions on the distribution license, adding them to § 2.1.1 would have been straightforward, only requiring the addition of the underlined clause: "Micro Focus hereby grants to Application Provider a personal, non-exclusive, non-transferable license to …market and distribute to Application Provider's customers …copies of RTS products…provided that such customers install their copy of the RTS product on only a single computer server and use the RTS only for an annually renewable license term."

On the flip side, treating §§ 3.1.5 and 3.2.8 as conditions would lead to the nonsensical notion that the 16 *other* paragraphs in the "APPLICATION PROVIDER OBLIGATIONS" section of the APA would also be treated as conditions, even though courts have held that similar terms are *not* conditions on the scope of a license.  Section 3.1.3, for example, prohibits modification of Micro Focus' "proprietary notices, logos or legends," while § 3.1.4 proscribes alteration of "the serial numbers applied by Micro Focus."  (APA at MIFO0000004).  The Second Circuit, however, has already held that such "authorship" notices "are to be considered covenants, not conditions." *Graham*, 144 F.3d at 237.  Likewise, § 3.2.5 provides that Identex "may not…disclose any confidential or proprietary information" of Micro Focus.'  (APA at MIFO0000004).  But such confidentiality obligations in software licenses have also been held to constitute covenants, not conditions.  *See Choice-Intersil Microsystems, Inc. v. Agere Systems*, Civ. 02-8219, 2004 WL 792387, at *3 (E.D. Pa. Apr. 12, 2004).

> **2.    Courts in analogous software licensing cases have repeatedly decided that payment-related terms are *not* conditions on license grants**

This case is not the first time a software owner has pressed the faulty syllogism Micro Focus urges, *i.e.*, (1) a customer's software usage in excess of numerical limits set forth in a

license agreement violated a condition limiting the scope of the license; (2) the customer's usage was therefore outside the scope of the license; (3) the owner was therefore permitted to sue for copyright infringement, instead of breach of contract, and (4) the owner could therefore claim the benefit of more powerful copyright infringement remedies, such as disgorgement of infringer profits (17 U.S.C. § 504(b)), not available in a contract action.

In at least four other district court cases, software owners made this very claim — and in each case, their contentions were rejected. In each case, the court followed a similar path. The court first looked to whether the restrictions at issue related to the payment of license fees (*e.g.*, "you are allowed to distribute up to 1,000 copies for a one-time $5,000 fee") and then focused on whether payment of the full license fee was a condition precedent to distribution and use of the software. In other words, did the license make explicit that the licensee/distributor had to *prepay* the full amount of the fees before it was authorized to distribute or use copies? Just like the case with the APA, in each of these decisions, there was no such prepayment requirement; each court therefore held that the payment-related terms were *not* conditions limiting the license. The following line of case law is illustrative:

In *Madison River Management Co. v. Business Management Software Corp.*, 387 F. Supp. 2d 521 (M.D.N.C. 2005), the owner of two software modules ("TCS Control" and "TCS Provide") licensed the products to BMS. BMS agreed to purchase "15 TCS Control Licenses" and "15 TCS Provide licenses" and "to pay for any actual use exceeding the 15 licenses." *Id.* at 528. When the owner later learned that BMS had made "excessive, unpaid use" beyond "the 15 licenses purchased," it sued for copyright infringement, arguing the numerical limits were conditions restricting the scope of the license. *Id.* at 533. The district court dismissed the claim on summary judgment, noting that under the agreement BMS could later "remit payment for the

actual number of licenses used." *Id.* at 534.  The license agreement "presupposes that excess use comes before payment, essentially granting permission for the excess use and then requiring payment for it" — in other words, "payment terms are covenants [not conditions] where permission precedes payment." *Id.* at 534.

In a case from this District, *BroadVision, Inc. v. Medical Protective Co.*, Civ. 08-1478-WHP, 2010 WL 5158129 (S.D.N.Y. Nov. 23, 2010), a "Master License Agreement" "specifically conditioned" defendant MedPro's "right to use the Software…on MedPro's payment to BroadVision of the applicable license fee" within 45 days of invoicing, but also provided that "in the event MedPro's use of the Software exceeds the number of licenses for which fees have been paid, MedPro shall promptly provide BroadVision with written notice and pay the required additional fees." *Id.* at *1-*2.  The district court followed *Madison River,* holding that because the Master License Agreement permitted the end user to pay for "excess use" after the fact — "without delivery of any additional product or service by BroadVision" — the payment terms were *not* conditions limiting the scope of the license grant.  *Id.* at *5.  The software owner was not entitled to claim copyright infringement and seek copyright damages.  *Id.*; *see also Graham*, 144 F.3d at 236 (noting "the award of copyright damages in this case is problematic" because a payment term was not a condition restricting the license).

In *Netbula,* 2008 WL 228036 (discussed above, *see* § I), the licensing term at issue recited that StorageTek "shall pay Netbula a one-time fee of…$5995 for the right to distribute up to 1000 units of software containing the Supporting Programs." *Id.* at *7.  StorageTek allegedly made excess use, but the district court refused to construe this payment term as a condition: "[O]n its face," the language does *not* "condition the license grant on prepayment.  Instead, the language reflects an agreement to sell licenses in units of 1000…Nowhere in Exhibit C to either of the

licenses, or in the entirety of the licenses, is there any notion that StorageTek's failure to pay, or 'prepay' as Plaintiff argues, is a limitation on the scope of the license or a condition precedent to the existence of the license." *Id.* at *7.

Lastly, *Quest Software, Inc. v. DirectTV Operations*, *LLC*, Civ. 09-1232-AG, 2011 WL 4500922 (C.D. Cal. Sept. 26, 2011), involved a contractual restriction on the number of CPUs on which Quest's Foglight software could be deployed, akin to the "per server" limitation Micro Focus emphasizes in this case. As the district court summarized, "the License Agreement…limited [DirecTV's] use of Foglight to a certain number of central processing units ('CPUs')" and Quest's theory was that DirecTV "'overdeployed' Foglight by using it on more CPUs than the License Agreement permitted." *Id.* at *1. Like the cases above, the court held that this "argument fails" because "the overdeployment and true-up provisions in the License Agreement permit Defendant to use Foglight on additional CPUs for an extra fee. These provisions are properly described as covenants because they do not concern the scope of the license, only the number of CPUs the license covers." *Id.* at *4.

Micro Focus' interpretation of the APA is just as unpersuasive as the failed arguments in *Madison River*, *BroadVision*, *Netbula*, and *Quest*. As discussed (see § I.A.1 above), the "per server" and "annual term" provisions are, at bottom, payment-related terms. They concern how Identex is to calculate the amount of license fees owed to Micro Focus, and when Identex is to make those payments. Moreover, just as in the cases above, *nothing* in the APA requires Identex to prepay the fees before distributing RTS copies. The APA certainly does not require end users like American Express to prepay for the full amount of usage before using the RTS copies they receive from Identex — as noted, the APA explicitly permits Identex to charge customers no fee at all for their use of the RTS. (APA at MIFO0000005 § 4.8). And, as explained, the APA makes

it clear that Micro Focus' concern was with being paid by Identex, not by the end user.  Just as in

*Madison River*, *BroadVision*, *Netbula*, and *Quest*, the relevant terms cannot be construed as

*conditions* limiting the scope of the software distribution license.

### 3. To the extent there is ambiguity, common law contract principles teach *against* construing the terms as conditions

Reading §§ 3.1.5 and 3.2.8 of the APA as conditions, rather than as promises or

obligations undertaken by Identex, also runs counter to the general common-law understanding of

the difference between the two.  The leading treatise *Corbin on Contracts* explains the

"differen[ce] in character" between promises and conditions well:

> [Promise] and condition are very clearly different in character.  One who makes a
> promise thereby expresses an intention that some future performance will be
> rendered and gives assurance of its rendition to the promisee…[a] condition is a
> fact or an event and is not an expression of intention or an assurance.  A promise in
> a contract creates a legal duty in the legal promisor and a right in the promisee; the
> fact or event constituting a condition creates no right or duty and is merely a
> limiting or modifying factor.

8 Corbin on Contracts § 30.12 (2016); *see also* Black's Law Dictionary (8th ed. 1999) at 1249

(defining "promise" as the "manifestation of an intention to act or refrain from acting in a

specified manner" and a "person's assurance that the person will or will not do something").

Sections 3.1.5 and 3.2.8 have the quintessential hallmarks of a promise under Corbin's

definition.  In § 3.1.5, Identex "express[es] an intention that some future performance will be

rendered" — namely, that when *in the future* Identex distributes copies of the RTS to its

customers, it will provide those customers with an "end user license agreement" with specific

clauses, *i.e.*, a "per [server] license" and "an annual term."  (APA at MIFO0000004 § 3.1.5).[12]

On the other hand, with respect to conditions, common-law contract principles across the

---

[12]     Likewise, in § 3.2.8, Identex makes a parallel *future* assurance: that when Identex provides
licenses to customers, it will agree only to "an annually renewable license term."

U.S. teach that "[c]onditions precedent are disfavored because they tend to work forfeitures" of contract benefits; for instance, the failure to satisfy a condition permits a counterparty to stop performing under an agreement. *MDY*, 629 F.3d at 939 (Cal. law); *see also, e.g.*, *Graham*, 144 F.3d at 237 (NY law: "Generally speaking, New York respects a presumption that terms of a contract are covenants rather than conditions."); *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 754 (11th Cir. 1997) (Fla law: "Conditions precedent are disfavored . . .").

For this reason, the common law of contract provides that, in cases of doubt, contract terms should be construed to *not* impose conditions. Thus, for example, the Restatement (Second) of Contracts states that "when it is doubtful" whether (1) "a duty is imposed on an obligee that an event occur" or (2) instead, "the event is [just] made a condition," "the first interpretation" — contractual duty, not condition — "is preferred if the event is within the obligee's control."[13] Restatement (Second) Contracts § 227. Although the wording is not especially elegant, the principle's application to this case is clear. Providing a customer with a EULA containing "per server" and "annual license" terms is indisputably an event "within the obligee's [Identex's] control." In that circumstance, if doubt remains as to whether the event is a "duty" on the part of Identex or a "condition," the preferred approach is to *avoid* interpreting it as imposing a condition — a common theme shared across many states' contract laws. *See, e.g.*, *Graham*, 144 F.3d at 237 (NY law: refusing to find conditions because the parties to an oral

---

[13]     The full text of this Restatement section reads:
Unless the contract is of a type under which only one party generally undertakes duties, when it is doubtful whether
      (a) a duty is imposed on an obligee that an event occur, or
      (b) the event is made a condition of the obligor's duty, or
      (c) the event is made a condition of the obligor's duty and a duty is
      imposed on the oblige that the even occur,
the first interpretation is preferred if the event is within the obligee's control.

agreement "did not clearly delineate its conditions and covenants."); *MDY*, 629 F.3d at 939 (Cal. law: "Wherever possible, equity construes ambiguous contract provisions as covenants rather than conditions.").

According to the Restatement commentary, this default rule against construing terms as conditions is in part to avoid the aforementioned "harsh results" and in part because the non-defaulting party would have a "remedy for breach," *i.e.*, a standard breach-of-contract claim. Restatement (Second) Contracts § 227(2) comment d.  Again, Micro Focus, for reasons of its own, chose not to sue its contractual counterparty, Identex, for breach — but that does not entitle Micro Focus to convert contract terms into conditions limiting § 2.1.1's clear license grant.

### B.     Paragraph 2 of the Cover Letter Cannot Be Construed as a Condition Because the APA's Conflicting Terms & Conditions Override It

Previously in this case, Micro Focus also argued that ¶ 2 of the one-page cover letter to the APA demonstrates that Identex's license was limited in scope because the letter characterizes the APA as "authoris[ing] you" — Identex — "to <u>distribute annual licenses</u> for the runtime system ('RTS')."  (APA at MIFO0000001, emphasis added).  This argument falls easily in the face of § 6.7.6 of the Terms & Conditions.  (*Id.* at MIFO0000006).  Section 6.7.6 states that the "cover letter" is part of "the entire agreement between the parties," but then makes clear that the *Terms & Conditions* control in the event of a conflict: "<u>These Terms and Conditions shall prevail</u> over any conflicting provisions in the cover letter addressed to Application Provider unless specifically overridden in the cover letter."  (APA at MIFO0000006 § 6.7.6, emphasis added).

The language of § 2.1.1's distribution license clearly conflicts with the cover letter. Section 2.1.1 does not speak to Identex merely "distribut[ing] annual licenses" to the RTS, *i.e.*, a paper document or electronic file.  Section 2.1.1. explicitly authorizes Identex to distribute copies *of the software itself* — "copies of the RTS products manufactured by Micro Focus."  (*Id.* at

MIFO0000004 § 2.1.1).   Moreover, as noted, § 2.1.1 does not include any language restricting

usage of the software *copies* received to any "annual term" — this is language directly tied to and

originating from Identex's license fee payment obligations in § 2 of Exhibit 1 of the APA.

Moreover, numerous other clauses in the Terms & Conditions reference distribution of software

"copies" or of "the Software Products" — not of paper/electronic licenses.[14]   The logical reading

of "annual licenses" in the cover letter is as discussed above, *i.e.* as a shorthand way of referring to

the manner in which the "Per Copy License Fee" will be calculated and will flow from Identex to

Micro Focus under Exhibit 1 § 2's financial terms.   (*Id.* at MIFO0000002 Ex. 1 § 2).

## III.   The Conclusory Views of Micro Focus' UK Law Expert Do Not Create Genuine Issues of Material Fact

Finally, Micro Focus may offer the Court the views of its U.K. law expert, Sir Robin

Jacob, as to how the APA should be interpreted, but Sir Jacob's views do not create any genuine

issues of material fact.   Indeed, under governing law, the Court should disregard them.

Micro Focus tendered Sir Jacob under Fed. R. Civ. P. 44.1 as an expert on the U.K. law of

contract interpretation.   But Rule 44.1 makes clear that the determination of foreign legal

principles is a "ruling on a question of law"; it is *not* a question of fact that, if disputed, precludes

summary judgment because it requires fact-finder resolution.   *Faggionato v. Lerner*, 500 F. Supp.

2d 237, 244 (S.D.N.Y. 2007).   Indeed, courts in this District have explained that "[u]ltimately, the

responsibility for correctly identifying and applying foreign law rests with the court," not with a

foreign-law expert witness.   *Id.*; *see British Int'l Ins. Co. v. Seguros La Republica, S.A.,* No.

90CIV.2370(JFK)(FM), 2000 WL 713057, at *8 (S.D.N.Y. 2000) (declining to apply the

"conclusory assertions of [plaintiff's] foreign law expert[.]").

---

[14]     *See, e.g.*, APA at MIFO0000004 § 4.1.1 ("each copy of the RTS despatched"); *id.* at § 4.4 ("copies of the RTS to be distributed"); *id* at § 4.8 ("distribute the Software Products").

In fact, Sir Robin Jacob's attempts to apply UK contract interpretation principles to the facts of this case can be freely ignored as contrary to the purposes of Rule 44.1.  As the leading Federal Practice & Procedure treatise explains, "[t]he purpose of an expert witness in foreign law is to aid the court in determining the content of the applicable foreign law, <u>not</u> to apply the law to the facts of the case."  9A Fed. Prac. & Proc. Civ. § 2444 (3d ed., emphasis added).  Even a cursory examination of the two-page "My opinion" section of Sir Jacob's report reveals nothing more than jumped-to conclusions about the "clear business purpose" of the APA and unhelpful rhetorical questions like "What is the business purpose of this if the AP can grant perpetual licences?"  (App'x Ex. 14 at 20-22 ¶ 41).  Such conclusory musings should be disregarded — and clearly do not create genuine issues of *fact* precluding summary judgment.  *See* Fed. Prac. & Proc. Civ. § 2444 ("It is not surprising, therefore, that federal courts have not felt bound by the testimony of foreign law experts and upon occasion have placed little or no credence in their opinions when not supported adequately or when the views were offered in too partisan a fashion."); *Faggionato*, 500 F. Supp. 2d at 244; *Seguros*, 2000 WL 713057, at *8.

## CONCLUSION

For the above reasons, this Court should enter summary judgment holding that, as a matter of contract interpretation, the "per server" and "annual term" provisions are *not* conditions restricting the scope of the distribution license Micro Focus granted to Identex (and therefore downstream customers like American Express) under the APA.  In addition, because Micro Focus has not presented any other theory in support of its copyright infringement claims, summary judgment should also be granted against Micro Focus' complaint in its entirety.

Dated:  December 16, 2016                Respectfully submitted,


                                        /s/ Aleksander J. Goranin
                                        David J. Wolfsohn (admitted *pro hac vice*)
                                        Aleksander J. Goranin (admitted *pro hac vice*)
                                        DUANE MORRIS LLP
                                        30 South 17th Street
                                        Philadelphia, PA 19103-4196
                                        Tel:    (215) 979-1000
                                        Fax:    (215) 979-1020

                                        Brian D. Siff (#2435394)
                                        DUANE MORRIS LLP
                                        1540 Broadway
                                        New York, New York 10036-4086
                                        Tel:    (212) 692-1000
                                        Fax:    (212) 692-1020

                                        *Counsel for Defendant/Counterclaim-Plaintiff*
                                        *American Express Company*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 16, 2016, a copy of the foregoing

motion papers in support of Defendant American Express Company's Motion for Summary

Judgment Regarding the Scope of the License Granted in the Micro Focus Application Provider

Agreement was served by agreement via electronic mail upon all counsel of record for Plaintiffs

Micro Focus (US), Inc., et al., listed below:

James David Weinberger, Esq.
Fross, Zelnick, Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, NY 10004
Tel:    (212) 813-5900
Fax:    (212) 813-5901
Email: jweinberger@frosszelnick.com

Stuart M.G. Seraina, Esq.
Patrice Meredith Clarke, Esq.
Kramon and Graham P.A.
One South Street, Suite 2600
Baltimore, MD 21202-3201
Tel:    (410) 752-6030
Fax:    (410) 539-1269
Email: sseraina@kg-law.com
          pclarke@kg-law.com

/s/ Aleksander J. Goranin
Aleksander J. Goranin